# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LARRY DANA,<br><br>    Plaintiff,<br><br>    v.<br><br>JOSH TEWALT, et al.<br><br>    Defendants. | Case No. 1:18-cv-00298-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Plaintiff Larry ("Kay") Dana's Motion for Preliminary Injunction (Dkt. 24), Defendants Elizabeth Adkisson and Josh Tewalt's[1] Motion to Dismiss (Dkt. 32), Defendant Corizon's Motion to Dismiss (Dkt. 39), and State Defendants' Motion to Dismiss (Dkt. 57). The Court held oral argument on December 12, 2019, and took the matters under advisement.

Upon review, the Court DENIES AS MOOT Dana's Motion for Preliminary Injunction, GRANTS Defendant Corizon's Motion to Dismiss, and GRANTS in PART and DENIES in PART Defendants' remaining Motions to Dismiss as outlined below.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Josh Tewalt was automatically substituted in this case for Henry Atencio as he is Atencio's "successor" to the directorship of IDOC. The case caption above should be used in all future proceedings. Sometimes the Court may refer to Atencio for context—because Atencio was the director of IDOC when this case began, and certain motions were filed on his behalf—however, it must be understood that since Dana sued Atencio in his official capacity, Tewalt and Atencio are, for all intents and purposes, one in the same (as the director of IDOC) regardless of who the Court may be referencing.

## II. BACKGROUND

### A. Factual Background

Plaintiff Kay Dana, formerly known as Larry Dana, is currently incarcerated by the Idaho Department of Corrections ("IDOC") in the Idaho State Correctional Institution ("ISCI") in Kuna, Idaho. Dana has been incarcerated since May of 2017.

Dana is a transgender woman—an individual whose gender identity (female) is different from the male gender assigned to her at birth. According to Dana, for much of her life she has struggled with gender dysphoria. Gender dysphoria ("GD") is a medical condition characterized by strong cross-gender identification, as well as strong and persistent discomfort about one's assigned sex. As a result of her GD, Dana experiences severe dysphoria and distress resulting from the incongruence between her male physical features and her female gender identity.

The most common forms of treatment for GD are counseling, the "real-life" experience of living full-time within the desired gender (such as wearing gender appropriate clothing), hormonal therapy, and sex affirming surgeries that conform primary or secondary sex characteristics with gender identity.

Dana explains that prior to incarceration, she lived full-time as a woman while with her family and close friends, but continued to live as a man at work in order to avoid conflict and to maintain job security. Since becoming incarcerated with IDOC, Dana has sought appropriate medical treatment, including access to feminizing hormones, evaluation for sex affirming surgery, and the ability to live as a woman while incarcerated. Dana

alleges that Defendants' have denied her access to this type of treatment, and that their actions—and inactions—have caused her harm and/or violated her rights.

In late 2017—after beginning her incarceration—Dana requested and received an assessment for GD by IDOC clinician Morgan Gruhot. Clinician Gruhot determined that Dana did not meet the diagnosis for GD at that time.

Dana received a second assessment for GD by IDOC chief psychologist Walter Campbell in August of 2018. After an interview with Dana and a review of her records, the record reflects that Dr. Campbell was prepared to diagnose Dana with GD; however, after an internal assessment with members of ISCI's Management and Treatment Committee ("MTC"), Dr. Campbell eventually concluded Dana did not meet the criteria for a GD diagnosis at that time as well.

In April 2019, Plaintiff's expert, Dr. Randi Ettner, met with, interviewed, and conducted a battery of psychological tests upon Dana. Ultimately, Dr. Ettner diagnosed Dana with GD and as having severe suicidal tendencies brought about and exacerbated by this untreated condition. Thus, Dr. Ettner's opinion was in direct contrast with Dr. Campbell's opinion. This contrast may have contributed to Dr. Campbell's eventual re-evaluation of Dana.

On October 2, 2019, Dr. Campbell completed a re-evaluation of Dana pursuant to IDOC policy, and at the request of Laura Watson—Dana's assigned clinician. Dr. Campbell concluded that a GD diagnosis for Dana was appropriate at that time. This decision was affirmed by the MTC.

## B. Procedural Background

On July 6, 2018, Dana commenced this action by filing Plaintiff's Verified Prisoner Civil Rights Complaint § 1983 for Damages, Declaratory Relief, and Injunctive Relief. Dkt. 3. At that time, Dana *was not* represented by counsel. Additionally, at that time, Dana did not have a diagnosis of GD from anyone.

On December 10, 2018, Judge B. Lynn Winmill entered an Initial Review Order by Screening Judge (Dkt. 8) in which he dismissed all named Defendants except for IDOC Director Henry Atencio and IDOC mental health clinician Elizabeth Adkisson. *Id.* The Court also dismissed all of Dana's claims except for her Eighth Amendment claims based on treatment for her GD and failure to protect. Dkt. 8, at 24–25.[2] Dana still did not have a diagnosis of GD at the time of Judge Winmill's Order.

On February 26, 2019, counsel for Dana appeared in this action. Dkt. 15. On May 16, 2019, Dana filed the pending motion for preliminary injunction. Dkt. 24. By that time, she had a diagnosis of GD from her expert, Dr. Ettner. In her motion, Dana moved the Court for a preliminary injunction:

> (1) ordering Defendants to provide her immediate access to necessary medical treatment, including
>> (a) acknowledging the gender dysphoria diagnosis of Ms. Dana's expert, Dr. Ettner and/or rendering its own diagnosis of gender dysphoria;
>> (b) hormone treatment therapy;

---

[2] Specifically, Judge Winmill found that "Plaintiff may proceed against Defendant Adkisson on her Eighth Amendment claims based on her treatment for gender dysphoria. Plaintiff may also proceed against Defendant Atencio, for injunctive relief only, on her Eighth Amendment gender-dysphoria treatment and failure-to-protect claims." *Id.*

> (c) access to gender-appropriate underwear, clothing, and commissary items; (d) any other treatment a medical professional qualified to assess and treat gender dysphoria determines to be medically urgent; and
>
> (2) prohibiting Defendants from disciplining or retaliating against Ms. Dana for expressing her gender identity, including wearing gender-appropriate underwear and clothing, and adhering to female grooming standards with respect to makeup and hair styling.

Dkt. 24, at 8 (reformatted for readability).

On July 1, 2019, Dana filed her First Amended Complaint. Dkt. 30. The First Amended Complaint added fourteen Defendants and ten new claims for relief. *Id.*

On July 15, 2019, Defendants Elizabeth Adkisson and Josh Tewalt filed the pending motion to dismiss based on Federal Rule of Civil Procedure 12(b)(6). Dkt. 32.

On July 15, 2019, Defendant Corizon, LLC ("Corizon"), filed the pending motion to dismiss based on Federal Rule of Civil Procedure 12(b)(6). Dkt. 39.

On August 8, 2019, Dana filed a supplemental brief in support of her motion for preliminary injunction.[3] Dkt. 46.

On August 23, 2019, the Ninth Circuit Court of Appeals issued its decision in *Edmo v. Corizon, Inc.*, (No. 19-35017, 2019 WL 3978329 (9th Cir. Aug. 23, 2019)). *Edmo* is a pending civil case in the District of Idaho brought by a transgender inmate housed at ISCI. The Court requested supplemental briefing from the parties on the impact, if any, of the Ninth Circuit's decision in *Edmo* on the instant case. Dkt. 51.

---

[3] At the time, Magistrate Judge Candy W. Dale presided over this case. Following a status conference, Judge Dale asked the parties to submit supplemental briefing on the preliminary injunction (Dkt. 43) specifically addressing how the first amended complaint related to the motion for preliminary injunction— since the preliminary injunction had been filed prior to the amended complaint.

During this same time period—on September 2, 2019—Defendants[4] filed the pending motion to dismiss based on Federal Rule of Civil Procedure 12(b)(6). Dkt. 57.

As already noted, on October 2, 2019, IDOC diagnosed Dana with GD. The Court requested supplemental briefing on what impact, if any, that diagnosis had on the pending motions. Dkt. 72. The parties obliged. Dkts. 74, 75. The Court held oral argument on all motions on December 12, 2019, and took the matters under advisement.

## III. ANALYSIS

### A. Defendants Motions to Dismiss (Dkt. 32, Dkt. 57, Dkt. 39)

At the outset, the Court notes that this case presents complicated legal questions. The procedural posture of the case further obscures matters. After an initial review, Judge Winmill found certain claims viable and allowed them to proceed. That said, the original complaint—that contained those viable claims—has since been superseded by Dana's First Amended Complaint. Frankly, some of the claims in the amended complaint are better articulated than in the original complaint, some are not.

Overall, however, Dana has done little to remedy the concerns raised by Judge Winmill in his prior review.[5] Dana ofttimes utilizes "group pleading"—generically claiming that "Defendants" caused "harm" or "violated her rights"—and formulized

---

[4] This motion is essentially a second motion to dismiss from the State Defendants; however, it was filed on behalf of all Defendants *except* Josh Tewalt and Elizabeth Adkisson as those defendants already had a motion to dismiss pending.

[5] As will be explained, even though that review is no longer operative, it is telling that Dana failed to address specific concerns outlined by Judge Winmill. Accordingly, it should come as little surprise that this Court's analysis mirrors that of Judge Winmill.

outlines of claim elements with little factual support *from this case*. True, Dana need only submit a short and plain statement, but that short and plain statement must nevertheless have details relevant to this case. As the Court has observed elsewhere, "Plaintiffs must identify actual harms suffered . . . and present sufficient facts upon which the Court can make a reasoned decision." *Does 1-134 v. Wasden*, No. 1:16-CV-00429-DCN, 2018 WL 2275220, at *1 (D. Idaho May 17, 2018).

The Court next turns to the substance of the pending motions to dismiss. Defendants Tewalt and Adkisson move under Federal Rule of Civil procedure 12(b)(6) for dismissal of Dana's First Amended Complaint. Dkt. 32. Dana is suing Tewalt in his official capacity as Director of the Idaho Department of Correction. Dkt. 30, ¶ 12. Dana does not specify whether she is suing Adkisson in her individual or official capacity. The Court assumes, however, that Dana is suing her in her official capacity as all actions took place in the course and scope of her employment.

Broadly speaking, Tewalt and Adkisson argue that Dana has failed to assert any factual allegations against them that would support any plausible claims for relief. Dkt. 32-1, at 4.

The remaining State Defendants have also filed a motion to dismiss (Dkt. 57) similarly asserting that Dana failed to allege sufficient facts against each of them to support any causes of action and/or that they are immune from suit.

Finally, Defendant Corizon also filed a motion to Dismiss (Dkt. 39) alleging that Dana barely even mentions Corizon or any Corizon employee in her Complaint, let alone

alleges sufficient facts to support any claims against it.

Because the substance and arguments of Adkisson and Tewalt's Motion to Dismiss (Dkt. 32) and State Defendants' Motion to Dismiss (Dkt. 57) substantially overlap, to avoid repetition, rather than analyzing each motion separately, the Court will simply analyze each claim. The Court will explain at the beginning of each section which Defendants are at issue and also explain at the end of each section whether the claim survives, and if so, against which defendants. The Court will then address Corizon's motion to dismiss.

    *1.    Motion to Dismiss Legal Standard*

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1121.

A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. If the facts pleaded are "merely consistent with a defendant's liability," or if

there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662 678, 682 (2009).

In deciding whether to grant a motion to dismiss, the court must accept as true all well-pleaded factual allegations made in the pleading under attack. *Id.*, at 663. A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001).

In cases decided after *Iqbal* and *Twombly,* the Ninth Circuit has continued to adhere to the rule that a dismissal of a complaint without leave to amend is inappropriate unless it is beyond doubt that the complaint could not be saved by an amendment. *See Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).

2.    *Analysis of State Defendants' Motions*

In her First Amended Complaint, Dana asserted twelve causes of action against the Defendants—in varying combinations: Three Eighth Amendment Claims (failure to provide medical treatment, excessive force, and failure to protect from harm); two Fourteenth Amendment claims (violation of equal protection – sex and violation of equal protection – diagnosis); one claim of discrimination in violation of the Americans with Disability Act; one claim of discrimination in violation of the Affordable Care Act; one claim for retaliation; and four Idaho State law claims (negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and battery).

The Court begins with two procedural items. First, Dana sued Defendant Jeff Zmuda in his official capacity as the Deputy Director of IDOC. Zmuda subsequently resigned from IDOC and is no longer the Deputy Director. Because Defendant Zmuda is no longer Deputy Director of IDOC, he is no longer a proper party to this action and is dismissed from all claims.[6]

Second, Defendants assert that as a branch of the state government, IDOC itself has immunity in federal court from all but Dana's Sixth Claim for Relief (violation of the ADA) under the Eleventh Amendment. Dkt. 57-1, at 3–4. Dana does not dispute this. Dkt. 69, at 3. Accordingly, IDOC is dismissed from all claims except Claim Six.

To state a plausible civil rights claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To be liable under Section 1983, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). Negligence is not actionable under Section 1983, because a negligent act by a public official is not an abuse of governmental power but merely a "failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Prison officials and prison medical providers generally are not liable for damages

---

[6] Normally, when a public officer who is a party in an official capacity resigns, the officer's successor is automatically substituted as a party. Fed. Rule Civ. Proc. 25(d). However, the Deputy Director position within IDOC is currently vacant, meaning there is no party to substitute for Zmuda in this action.

in their individual capacities under Section 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent committed misconduct. *Id.* However, a defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

A plaintiff can establish this causal connection by alleging that a defendant (1) "set[] in motion a series of acts by others"; (2) "knowingly refus[ed] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury"; (3) "failed to act or improperly acted in the training, supervision, or control of this subordinates"; (4) acquiesc[ed] in the constitutional deprivation"; or (5) "engag[ed] in conduct that showed a reckless or callous indifference to the rights of others." *Starr*, 652 F.3d at 1205–09.

A plaintiff cannot simply restate these standards of law in a complaint. Instead, a plaintiff must provide specific facts that support the element of each claim and must allege facts showing a causal link between each defendant and his or her injury or damage. Alleging "the mere possibility of misconduct" is not enough. *Iqbal*, 556 U.S. at 679.

The Eighth Amendment to the United States Constitution, as incorporated against the States by the Fourteenth Amendment, protects prisoners against cruel and unusual

punishment. To state a plausible Eighth Amendment claim,[7] a prisoner must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of a defendant's actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

To rise to the level of an Eighth Amendment violation, the deprivation alleged must be objectively sufficiently harmful, *Farmer*, 511 U.S. at 834, or, in other words, sufficiently "grave" or "serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). As the Supreme Court has explained:

> Not every governmental action affecting the interest or well-being of a prisoner is subject to Eighth Amendment scrutiny, however. After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.

*Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotation marks, citation, and alteration omitted).

---

[7] Dana brings her First, Second, and Third claims under the Eighth Amendment. While additional legal standards and explanation will be given relative to those individual claims, the Court provides a broad overview of Eighth Amendment jurisprudence here.

As for the subjective prong of an Eighth Amendment analysis, "deliberate indifference entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled in part on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

a. Claim One: Failure to Provide Necessary Medical treatment

Dana brings her First Claim—Failure to Provide Necessary Medical Treatment in violation of the Eighth Amendment—against all Defendants except Evancho, Walton, and Smyth. Dkt. 30, at 16.

The Eighth Amendment includes the right to adequate medical care in prison, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Regarding the objective prong in cases concerning a prisoner's inadequate medical care claim, the Supreme Court has explained that "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Ninth Circuit has defined a "serious medical need" in the following way:

> Failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

*McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds by WMX Techs., Inc. v Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

An allegation that a prisoner suffers from untreated GD is generally sufficient to plausibly allege a serious medical need. *See, e.g., Mitchell v. Kallas*, 895 F.3d 492, 499 (7th Cir. 2018) ("[L]eaving serious medical conditions, including gender dysphoria, untreated can amount to unconstitutional deliberate indifference."); *Denegal v. Farrell*, No. 1:15-cv-01251-DAD-MJS, 2016 WL 3648956, at *5 (E.D. Cal. July 7, 2016) ("Plaintiff's allegation that she suffers from untreated symptoms of gender dysphoria is sufficient to allege a serious medical condition."). The lack of a medical opinion diagnosing a condition or recommending treatment is not fatal to a plaintiff's claim if "the state has failed to provide [the plaintiff] access to a physician competent to evaluate her." *Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015).

A prison official or prison medical provider acts with "deliberate indifference . . . only if the [prison official or provider] knows of and disregards an excessive risk to inmate health and safety." *Gibson*, 290 F.3d at 1187 (internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also

draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (footnotes omitted). However, medical malpractice or negligence will not support a cause of action under the Eighth Amendment, *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam), and a delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm. *McGuckin*, 974 F.2d at 1060.

Non-medical prison personnel generally are entitled to rely on the opinions of medical professionals with respect to the treatment of an inmate. However, if "a reasonable person would likely determine [the medical treatment] to be inferior," the fact that an official is not medically trained will not shield that official from liability for deliberate indifference. *Snow*, 681 F.3d at 986 (internal quotation marks omitted); see also *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (stating that non-medical personnel may rely on medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner") (internal quotation marks omitted)).

The Eighth Amendment provides no right to any specific treatment. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Differences in judgment between an inmate and

prison medical providers regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *see also Lamb v. Norwood*, 895 F.3d 756, 760 (10th Cir. 2018) ("[P]rison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants."). To state an Eighth Amendment claim "involving choices between alternative courses of treatment," the plaintiff must plausibly allege "that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Stated another way, a plaintiff must plausibly allege that medical providers chose one treatment over the plaintiff's preferred treatment "even though they knew [plaintiff's preferred treatment] to be medically necessary based on [the plaintiff's] records and prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1117 (N.D. Cal. 2015).

The Eighth Amendment requires that prison medical providers exercise informed medical judgment. Therefore, if a certain medical treatment is denied because of a blanket governmental policy, rather than an individualized determination of the appropriate treatment for the particular inmate, a factfinder may infer deliberate indifference. *See Rosati*, 791 F.3d at 1039–40 ("Rosati plausibly alleges that prison officials were aware of her medical history and need for treatment, but denied the surgery because of a blanket policy against [sex reassignment surgery]."); *Allard v. Gomez*, 9 F. App'x 793, 795 (9th

Cir. 2001) (unpublished) ("[T]here are at least triable issues as to whether hormone therapy was denied . . . on the basis of an individualized medical evaluation or as a result of a blanket rule, the application of which constituted deliberate indifference to [plaintiff's] medical needs.").

However, if providers make an individualized assessment and choose a treatment that—in their informed judgment—is medically appropriate, a plaintiff generally cannot prevail on a deliberate indifference claim. *See Lamb*, 895 F.3d at 760 ("[The plaintiff] is obtaining psychological counseling and hormone treatments, including estrogen and testosterone-blocking medication. Though prison officials have not authorized surgery or the hormone dosages that [the plaintiff] wants, the existing treatment precludes a reasonable fact-finder from inferring deliberate indifference."); *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986) ("While the medical community may disagree among themselves as to the best form of treatment for plaintiff's condition, the Department of Corrections made an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiff's medical needs. The medical decision not to give plaintiff estrogen until further study does not represent cruel and unusual punishment."). In such a case, a plaintiff can state a plausible Eighth Amendment claim only if the defendants intentionally interfered with appropriate medical diagnosis and treatment—for example, by "creat[ing] a pretextual report to support denial" of a requested treatment. *Norsworthy*, 87 F. Supp. 3d at 1117 (denial of sex reassignment surgery).

In this case, Dana alleges that Defendants failed to provide adequate and necessary

medical treatment for her GD, in violation of the Eighth Amendment. Dkt. 30, ¶¶ 58, 59. In response, all Defendants argue that Dana has failed to allege any facts to support a plausible inference that Defendants were involved in, or were even aware of, Dr. Walter Campbell's clinical assessments after which he determined that Dana did not meet the criteria for GD. Dkt. 32-1, at 5.

In response to Defendants Adkisson and Tewalt, Dana asserts that because the Eighth Amendment medical-treatment claim from her original Complaint against Defendant Atencio (now Tewalt) and Defendant Adkisson survived the initial screening process, Defendants' contention that the First Amended Complaint lacks sufficient facts is absurd. Dkt. 41, at 9.

Dana's suggestion that, because Judge Winmill allowed her to proceed against Defendants Tewalt and Adkisson in the Initial Review Order, she should similarly be allowed to proceed against them now is incorrect. "[An] amended complaint supersedes the original, the latter being treated thereafter as non-existent." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) *overruled in part on other grounds by Lacey v. Maricopa County*, 693 F.3d 896, (9th Cir. 2012) (en banc). Although Judge Winmill may have allowed Dana to proceed with a portion of her Eighth Amendment claims from her original complaint, the filing of her First Amended Complaint effectively negates both her original complaint and the Initial Review Order.

In response to all other Defendants, Dana contends that Defendants were repeatedly placed on notice of the substantial risk of serious harm she faced resulting from the denial

of a diagnosis and treatment for GD. Dkt. 69, at 6.

At the time Dana filed her First Amended Complaint, IDOC had not diagnosed her with GD. As the Court stated above, the lack of a medical opinion diagnosing a condition or recommending treatment is not fatal to a plaintiff's claim if "the state has failed to provide [the plaintiff] access to a physician competent to evaluate her." *Rosati*, 791 F.3d at 1040. Here, however, Dana was given access to a competent physician, Dr. Campbell, who ultimately concluded that Dana was not entitled to a GD diagnosis.

Following Dr. Campbell's determination that Dana did not have GD, it is illogical to suggest that Defendants failed to provide adequate medical treatment for a diagnosis that Dana did not have. Further, because Dana has not individually named any Defendant or explained what role any individual Defendant had in denying her a diagnosis, Dana has not alleged sufficient facts to support this claim.[8]

Finally, Dana's contention that Defendants were repeatedly placed on notice of the substantial risk of serious harm resulting from the denial of a diagnosis and treatment for

---

[8] As will be a repeated theme throughout this decision, Dana must provide more factual details in order to support her claims. At oral argument, Dana argued this may prove problematic as the information necessary to support her claims is almost solely within the care and custody of Defendants, and, until some discovery has taken place, she will not know the extent of her claims. While this illustrates the age-old struggle a court faces in determining the sufficiently of a plaintiff's compliant, Dana's suggestion reverses the order of events in litigation. To be sure, as discovery occurs, claims are clarified, but the claims must exist in the first place. At the very least, Dana must provide all the facts known to her (the "upon information and belief" language commonly employed by plaintiffs is a good example—a plaintiff may not know everything about the claim, but at the very least, knows the factual basis for what happened). Additionally, while Dana has filed suit against unknown "Does" she must, nonetheless, still provide more than a mere recitation of the legal elements of any of her claims. There must be something plausible and tangible for Defendants and the Court to work with—vague allegations that "Defendants violated my rights" are insufficient. Finally, if discovery does in fact lead to new claims, Dana always has the opportunity to move to amend to add claims identified during discovery. But at this stage, the Court can only allow claims to proceed that sufficiently put Defendants on notice of what the allegations are against them and how those facts line up with applicable legal causes of action.

GD lacks any support in the record. Dkt. 69, at 6. Dana does not specify what this "notice" looked like, which Defendants received this alleged notice, or when the alleged notice was given. This is insufficient to support a plausible inference that any of the named Defendants knew of, and disregarded, an excessive risk to her health and safety.

Dana's Eight Amendment medical-treatment claim is dismissed without prejudice.[9]

b. Claim Two: Excessive Force

Dana brings her Second Claim—Excessive Force in violation of the Eighth Amendment—solely against Defendant Evancho.

The Eighth Amendment only prohibits "cruel and unusual" punishment. Therefore, the use of force amounts to a constitutional violation only if it is applied "maliciously and sadistically for the very purpose of causing harm." *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2003) (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). Under the Eighth Amendment, the Court must look for malicious and sadistic force, not merely objectively unreasonable force, which necessarily involves a more culpable mental state than that required for excessive force claims arising under the Fourth Amendment. *Id.*

Not every "malevolent touch" by a prison guard gives rise to an Eighth Amendment claim. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary is the peace of a judge's chambers, violates a prisoner's constitutional rights"). "The Eight Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from

---

[9] As the Court will explain in the conclusion section of this decision, Dana will be allowed to file a motion for leave to amend.

constitutional recognition *de minimus* use of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9–10 (internal quotation marks omitted).

Dana alleges that on one occasion, Defendant Evancho cuffed her arms behind her back when escorting her from her cell and forcefully shoved her down a walkway. Dkt. 30, at ¶ 67. Dana alleges that Defendant Evancho did so with malicious and sadistic force.

Defendant Evancho argues that Dana has failed to set forth any factual allegations regarding a "culpable mental state" or to support the claim that Defendant Evancho acted in a malicious and sadistic manner. Dkt. 57-1 at 10. Defendant Evancho is correct.

Beyond Dana's formulaic recitation of the elements for an excessive force claim, there is nothing in the First Amended Complaint that suggests Defendant Evancho acted maliciously and sadistically while escorting Dana from her cell. The obvious alternative explanation is that Evancho inadvertently, negligently, or recklessly caused Dana harm while escorting her. Without more facts or details, Dana's excessive force claim must be dismissed.

c. Claim Three: Failure-to-Protect

Dana brings her Third Claim—Failure-to-Protect in violation of the Eighth Amendment—against all Defendants. Dana alleges that Defendants failed to protect her from harm by deliberately withholding necessary medical treatment; housing her in a manner which allowed another prison inmate to sexually assault her; and failing to follow the requirements of the Prison Rape Elimination Act ("PREA"). Dkt. 30, ¶¶ 72–74.

Under the Eighth Amendment's standard of deliberate indifference, prison officials are liable for denying a prisoner needed medical care only if the person "knows of and disregards an excessive risk to inmate health and safety." *Gibson*, 290 F.3d at 1187 (internal quotation marks omitted).

Prison officials who act with deliberate indifference "to the threat of serious harm or injury" by one prisoner against another are subject to liability under § 1983. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (internal quotation marks, citation, and alterations omitted). Although even an obvious danger does not result in liability if the official is not subjectively aware of it, a prison official cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id.* at 843.

As noted, Dana alleges that Defendants failed to protect her in three respects: (1) by deliberately withholding necessary medical treatment; (2) by housing her in a manner which allowed another prison to sexually assault her; and (3) by failing to follow the requirements of the PREA. Dkt. 30, ¶¶ 72–74. The Court will briefly address each sub-category of Dana's Third Claim in turn.

*(i)      Withholding of Medical Treatment*

Defendants contend that Dana has alleged no facts to support a plausible inference that they are liable for the alleged withholding of medical treatment. Dkt. 32-1, at 5; Dkt. 57-1, at 11. Specifically, Defendants argue that Dana's failure to identify any Defendant, by name, that withheld her medical treatment renders her claim insufficient. Dkt. 57-1, at 11. In response, Dana summarily asserts that Defendants' actions in denying her medical treatment are deliberate and that Defendants were repeatedly placed on notice of the substantial risk of harm resulting from the denial of treatment. Dkt. 41, at 10; Dkt. 69, at 5–6.

Dana has not alleged what role, if any, any specific Defendant had in the alleged withholding of medical treatment. Specially, Dana fails to identify any Defendant that withheld medical treatment from her or influenced others to do so. Nor does she allege any actions sufficient to support the idea that Defendants actually knew of a risk of harm in denying her medical treatment. Dana appears to be suggesting that the actions she took, including using illicit drugs and attempting suicide, both of which were purportedly in response to Defendants' denial of medical treatment, placed Defendants on notice of the substantial risk of harm. Critically, however, Dana does not allege in her Complaint that Defendants knew these actions were related to the denial of medical treatment or that Defendants knew of the risk at the time of the alleged denial. Dana has not stated a plausible failure-to-protect claim against Defendants for withholding of medical treatment based upon these facts.

*(ii)     Sexual Assault*

In response to Dana's claim that they housed her in a way that allowed another dangerous inmate to sexually abuse and/or assault her, Defendants contend that Dana has failed to allege facts to support a plausible inference that (prior to the alleged incident) they knew Dana was at a risk of being sexually assaulted in the first place. Dkt. 57-1, at 11. Defendants repeat their argument that Dana's failure to specifically identify which Defendants took the particular actions she levies against them is fatal to her claim for failure-to-protect. *Id.* The Court agrees.

Dana has not identified which Defendants made the decision to house the allegedly violent inmate in the same tier as Dana. The only Defendant that Dana identifies as potentially being aware of the pending threat is Defendant Walton. Dkt. 30, ¶ 50. Even then, however, Dana does not allege that Defendant Walton had any role in the decision of where to house her or the other inmate, only that she "reported concerns" to him and "requested to be moved." *Id.*

While these are the types of details the Court expects in a Complaint, it is still not enough to "connect the dots." Dana has not alleged that Walton—or any other Defendant— actually had any *authority* or *input* in the decisions regarding her housing, or that any other Defendants knew of the risk posed to Dana by the alleged attacker. Dana has not stated a plausible failure-to-protect claim for damages against any specific Defendant other than (potentially) Walton. Even then, the Court needs more information about Walton's involvement, his authority and actions, and how those materially affected Dana. Dana has

not stated a plausible failure-to-protect claim against Defendants based upon these facts.

*(iii)*     *Prison Rape Elimination Act*

Dana claims that following the alleged assault (mentioned just previously) she called the PREA, but was told that if she continued to do that she would be thrown "in the hole." Dkt. 30, ¶ 52. Again, Defendants argue that Dana's failure to outline specific facts or properly name any Defendant that failed to follow the PREA requirements renders her claim insufficient. Dkt. 57-1, at 11.

Dana did not take the opportunity to respond to this argument by Defendants. The Court's finding above apply here as well. In addition to not identifying any Defendant by name, Dana did not allege which actions by Defendants supposedly violated PREA requirements. The limited information here is simply not sufficient to support a failure-to-protect claim for failing to follow PREA requirements.

Dana has not alleged sufficient facts to proceed on failure-to-protect claim against Defendants in any of the three instances outlined. Therefore, Dana's failure-to-protect claim based on the three theories discussed above will be dismissed at this time.

d.    <u>Claim Four: Discrimination Based on Sex</u>

Dana's brings her Fourth Claim—Violation of Equal Protection – Sex —against all Defendants except Evancho, Walton, and Smyth. Dana claims that Defendants discriminated against her based on sex, sex stereotyping, and/or gender identity in violation of the Equal Protection Clause of the 14th Amendment.

"The Equal Protection Clause requires the State to treat all similarly situated people

equally." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (internal citation omitted). However, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Furnace*, 705 F.3d at 1030 (quoting *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998)).

Additionally, even where similarly situated persons are treated differently by the state, state action is presumed constitutional and "will not be set aside if any set of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U.S. 420, 426 (1961). Absent evidence of invidious discrimination, the federal courts should defer to the judgment of prison officials. *See id.* at 277; *Youngbear v. Thalacker*, 174 F. Supp. 2d 902, 916 (D. Iowa 2001) ("There can be no 'negligent' violations of an individual's right to equal protection . . . . There is no evidence from which the court may infer that the defendants' asserted reasons for delaying the construction of a sweat lodge at the [prison] were a pretext for discrimination.").

Equal protection claims alleging disparate treatment or classifications are generally subject to a heightened standard of scrutiny if they involve a "suspect" or "quasisuspect" class, such as race, national origin, or sex, or when they involve a burden on the exercise of fundamental personal rights protected by the Constitution. *See, e.g., City of Cleburne v.*

*Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985). Otherwise, equal protection claims are subject to a rational basis inquiry. *See Heller v. Doe*, 509 U.S. 312, 319–20 (1993).

Under heightened scrutiny given to a quasi-suspect class, the challenged classification must be "substantially related to a legitimate state interest." *Mills v. Habluetzel*, 456 U.S. 91, 99 (1982).

In a rational basis analysis, however, the relevant inquiry is whether a defendant's action is "patently arbitrary and bears no rational relationship to a legitimate governmental interest." *Vermouth v. Corrothers*, 827 F.2d 599, 602 (9th Cir. 1987) (quotation omitted).

In her First Amended Complaint, Dana alleges that "Defendants have discriminated against her based on her sex by failing to provide adequate and necessary medical diagnosis and treatment for GD and by disciplining her based on sex-based stereotyping about the ways in which Dana should appear, act, or express herself based on her sex assigned at birth." Dkt. 30, ¶ 81. Dana further alleges that Defendants are discriminating against her based on sex by refusing to allow her access to feminine items that would normally be provided to similarly situated female prisoners. Dkt. 30, ¶¶ 83, 84.

Defendants argue that Dana has failed to state a plausible claim for relief, in part because she does not identify any particular Defendant that intentionally failed to provide medical care, disciplined her, or denied her commissary products. Dkt. 57-1, at 14. Even if those contentions were present, however, Defendants also argue that any such actions would be subject to rational basis review and that they had a legitimate penological interest in everything they did: Dana's safety.

Under rational basis review, a plaintiff can prevail only if (1) she is similarly situated with persons who are treated differently by the defendants, and (2) the defendants have no rational basis for that disparate treatment. Stated another way, prison officials need show only a rational basis for dissimilar treatment to defeat the merits of an inmate's claim. *Vermouth,* 827 F.2d at 602. In addition to the deference inherent in a rational basis inquiry, an additional layer of deference to prison officials is required under *Turner v. Safley*, 482 U.S. 78, 89–81 (1987), in which the Supreme Court held that a prison official's action is constitutional so long as it is reasonably related to a legitimate penological purpose. *Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) ("In the prison context, . . . even fundamental rights such as the right to equal protection are judged by a standard of reasonableness— specifically, whether the actions of prison officials are reasonably related to legitimate penological interests." (quotation omitted)). Under this framework, Defendants claim that even if Dana could show they treated her differently, it was justified.

In response, Dana first contends that the refusal to provide Dana with medically necessary care because she is transgendered is discrimination based on sex, meaning heightened scrutiny, rather than rational basis review, is required. Dkt. 69, at 9. In support of this contention, Dana cites to District of Idaho Magistrate Judge Candy W. Dale's Decision in *F.V. v. Barron*, in which she said: "to conclude discrimination based on gender identity or transsexual status is not discrimination based on sex is to depart from advanced medical understanding in favor of archaic reasoning." 286 F. Supp. 3d 1131, 1144 (D.

Idaho 2018). Even assuming this is the applicable standard,[10] Dana has still not alleged sufficient facts to meet her burden under *Iqbal* and *Twombly*.

Here, while Dana has provided more details than in some of her other claims,[11] she still has not specifically identified which Defendants allegedly disciplined her or permitted the discipline of her for sex-based behaviors. Alternatively, even if Dana cannot identify specific individuals, she must nonetheless identify what the alleged disciplinary conduct was and when it occurred, which she did not do. Dana's Fourth Claim of Discrimination Based on Sex is dismissed.

e. Claim Five: Discrimination based on Diagnosis

Dana brings her Fifth Claim—Violation of Equal Protection – Diagnosis —against all Defendants except Evancho, Walton, and Smyth. Dana alleges that Defendants have discriminated against her based on her GD by providing inferior medical care as compared to similarly situated inmates with medical and mental conditions and/or diagnoses other

---

[10] The Court is not implying this is the wrong standard, however, the Court has serious concerns and questions about what level of scrutiny should be applied in this case. As discussed briefly during oral argument, Dana has not provided a clear roadmap for the Court on whether it should be comparing her to similarly situated men, similarly situated women, similarly situated "transitioning" individuals, similarly situated transgendered individuals, or similarly situated prisoners. This will be critical because, for example, under rational basis review, the Court could reasonably find that the denial of access to feminine items that would ordinarily be provided to female prisoners and the refusal to allow Dana to appear as a woman are rationally related to the legitimate penological interest in keeping Dana safe from assault and/or harassment by male inmates. *However,* under a heightened standard, that may or may not be the case. While Dana argues the appropriate standard of review at length, that is not before the Court at this time. The question today is whether the Complaint is sufficient. The Court will decide what level of scrutiny to apply to Defendants actions after it has determined the scope of those actions.

[11] Dana claims Defendants denied requests for female commissary products such as underwear and cosmetics and that Defendants disciplined her for wearing a "feminine" hairstyle, but provides little else in the way of details. Again, the Court finds itself in the difficult position of not wanting to require more than is necessary of Dana, but wanting Defendants to have fair and accurate notice of the claims against them.

than GD. Dkt. 30, ¶ 95.

In short, Dana alleges that Defendants failed to provide her with adequate diagnosis and treatment because of her GD. Dkt. 30, ¶ 94. Dana further alleges that by "official policy, procedure, custom, and/or practice, Defendants discriminate against transgender inmates diagnosed with gender dysphoria or seeking to be diagnosed with gender dysphoria, including [Dana], by providing them with inferior medical care as compared to similarly situated inmates with medical and mental conditions and/or diagnoses other than gender dysphoria." Dkt. 30, ¶ 95.

Defendants contend that Dana's claim is premature as she has not yet been diagnosed with GD,[12] and therefore could not claim discrimination on this basis. Dkt. 57-1, at 14. Defendants also assert that Dana failed to set forth a plausible claim for relief, as her First Amended Complaint is devoid of particularized factual allegations against an individual Defendant and does not illustrate that any Defendant acted with an intent or purpose to actually discriminate against her. Dkt. 57-1, at 14–15.

In response, Dana asserts that Defendants miss the point. Dkt. 69, at 11. Dana asserts that she was being discriminated against because of Defendant's failure to provide a GD diagnosis. *Id.* This argument is somewhat convoluted. In essence, Dana claims that Defendants discriminated against her and her medical condition (GD) by not giving her that diagnosis (GD) in the first instance. This is difficult to accept, however, as medical professionals initially determined a GD diagnosis was not appropriate before later

---

[12] As previously noted, Dana was diagnosed with GD after Defendants filed this motion.

determining it was. Contrary to Dana's assertions that the recent GD diagnosis is a smoking gun for Defendants, this changed circumstance could show that Defendants *did care* about Dana and her conditions and worked to meet her needs *when appropriate*.

Broadening the argument—beyond the specific GD diagnosis—Dana's claim is essentially a "failure to treat" claim based on her perception that she should have been diagnosed with a certain medical condition but was not. But as this Court has repeatedly pointed out, differences in judgment between inmates and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish an Eighth Amendment claim. *See, e.g., Ruznic v. Corizon Med. Servs.*, No. 1:19-CV-00383-BLW, 2019 WL 6702419, at *4 (D. Idaho Dec. 9, 2019); *Prien v. Smith*, No. CV08-465-S-BLW, 2010 WL 76453, at *5 (D. Idaho Jan. 5, 2010), *aff'd*, 411 F. App'x 982 (9th Cir. 2011). "[T]o prevail on a claim involving choices between alternative courses of treatment, [Plaintiff] must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk'" to Plaintiff's health. *Toguchi v. Chung,* 391 F.3d 1051, 1058 (9th Cir.2004) (quoting *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996).

More importantly, as with most of her claims, Dana simply recites elements, but does not identify any actual policy, procedure, custom, or practice[13] that resulted in the

---

[13] Dana references an IDOC "policy," but does not specify what that policy is or how any defendant specifically violated that, or any other, policy. *See* Dkt. 30, ¶ 94-95 ("Defendants [] failed . . . to provide Plaintiff with adequate diagnosis and treatment according to IDOC *policies*" and "By *official policy*, procedure, custom and/or practice, Defendants discriminate against transgender inmates diagnosed with gender dysphoria or seeking to be diagnosed with gender dysphoria, including Plaintiff, by providing them with inferior medical care") (emphasis added).

alleged discrimination against her. Dana's fifth Claim of Discrimination Based on Gender Dysphoria is dismissed.

f. Claim Six: Discrimination on the Basis of Disability

Dana brings her Sixth Claim—Discrimination in Violation of the Americans with Disabilities Act—against IDOC and Corizon. Corizon's liability is addressed later on.

Pursuant to Title II of the ADA, a "qualified individual with a disability" cannot "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The plain text of Title II of the ADA unambiguously extends to state prison inmates. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998).

Dana alleges that based on her GD, she suffers from a disability within the meaning and scope of the ADA. Dkt. 30, ¶ 101. Dana argues that Defendants discriminated against her because of this alleged disability and denied her the benefits of public services, programs, and activities by failing to provide adequate and necessary medical diagnosis and treatment; failing to provide proper training to custody and health staff in responding to persons with GD, and by disciplining Dana and depriving her of programs and activities because of her actions.

Defendants and Dana spend significant time arguing whether GD is a recognized disability under the ADA. However, because Dana had not been diagnosed with GD at the time she filed her Amended Complaint, it is difficult to determine how, if at all, IDOC

discriminated against her on the basis of a disability that she was not diagnosed with. In other words, Dana appears to be saying that Defendants discriminated against her based on *symptoms* associated with a *potential* condition, but not the condition itself—because again, it was undiagnosed.

While Dana has done better with this claim in identifying *how* and in *what manner* IDOC allegedly violated the ADA (Dkt. 30, ¶ 102) these allegations are still too vague to support a claim for relief. More importantly, Dana has not identified *who* violated her rights and does not outline any IDOC policy or procedure that resulted in the alleged discrimination. This is insufficient to proceed on an ADA claim. Dana's claim for violation of the ADA will be dismissed against IDOC at this time.

g. Claim Seven: Violation of the Affordable Care Act

Dana brings her Seventh Claim—Violation of the Affordable Care Act—against Defendants Twealt, Ramirez, Valley, Christensen, Dietz, and McKay. Dkt. 30, at 24. Dana alleges that "Defendants have discriminated and continue to discriminate against [her] on the basis of sex when they deny her adequate and necessary medical diagnosis and treatment on the basis that she is transgender, has been diagnosed with gender dysphoria, and is attempting to transition genders." Dkt. 30, ¶ 109.

Section 1557 of the ACA prohibits covered entities from discriminating on the basis of sex for the purposes of providing health care services. 42 U.S.C.A. § 18116(a). Covered entities include "any health program or activity, any part of which is receiving Federal financial assistance . . . ." *Id.*

Defendants Tewalt, Ramirez, Valley, Christensen, Dietz, and McKay assert that there is no factual support connecting them to Dana's alleged request for a medical diagnosis, medical care, treatment, or denial of the same. Dkt. 57-1, at 17. In response, Dana contends that they are aware of—some even having personally participated in—the work of the MTC, including participating in decisions relating to Dana's care. Dkt. 69, at 15. Dana also claims that they have been on notice that Dana's own expert, Dr. Ettner, diagnosed her with GD no later than May 2019. *Id.* Dana appears to be alleging that Dr. Ettner's diagnosis required Defendants to provide Dana with treatment for GD, despite the determination made by their own doctor, Dr. Campbell, that Dana did not warrant a GD diagnosis. This assumption, however, is flawed as differing medical opinions cut against Eight Amendment action. *See, e.g., Burnett v. Dugan*, No. 08-CV-1324-L WVG, 2011 WL 1002171, at *5 (S.D. Cal. Feb. 23, 2011), *report and recommendation adopted*, No. 08CV1324 L WVG, 2011 WL 1002145 (S.D. Cal. Mar. 21, 2011), *aff'd*, 536 F. App'x 739 (9th Cir. 2013) (finding that "challenges to differing medical opinions cannot be the basis for an Eighth Amendment violation").

Dana does not name any individual Defendant who was aware of the work of the MTC or that participated in decisions related to Dana's care, nor does she name any individual Defendant who was made aware of Dr. Ettner's diagnosis. As with the prior claims, Dana has not set forth the requisite factual allegations to support this claim.[14]

[14] Additionally, as the Court outlined in footnote 10, at some point during this litigation, the Court will need to decide the level of scrutiny under which to review Defendants actions. That determination will play into this claim as the Court will be analyzing the interplay between discrimination based on sex, discrimination

h. Claim Eight: Retaliation in Violation of the First Amendment

Dana brings her Eighth Claim—Retaliation—against Tewalt, Ramirez, Valley, Christensen, Dietz, McKay, Walton, and Smyth. Dkt. 30, at 25.

Dana alleges that Defendants retaliated against her for using the PREA hotline, by threatening to put her in solitary confinement, and by confiscating her feminine items. Dkt. 30, ¶ 115. Dana asserts that this alleged retaliation deprived her of her right to freedom of speech guaranteed the First Amendment. Dkt. 30, at ¶ 117.

> Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (citing *Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000)). "[B]are allegations" of a retaliatory motive are insufficient to support a retaliation claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985); *see also Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) ("We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient."). When analyzing a prison official's proffered reasons for allegedly retaliatory conduct, the Court must "afford appropriate deference and flexibility to prison officials." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (internal quotation marks omitted).

Not every retaliatory act taken by an official can be considered an adverse action

---

based on gender identity, and discrimination based on transsexual status—namely whether these are one in the same or different, and how the ACA applies.

that chills the exercise of protected speech. The proper inquiry asks whether the official's action "would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal quotation marks omitted).

A plaintiff asserting a retaliation claim under § 1983 also "must show a causal connection between a defendant's retaliatory animus and [the plaintiff's] subsequent injury." *Hartman v. Moore*, 547 U.S. 250, 259 (2006). Retaliatory motivation is not established simply by showing an adverse action by the defendant *after* protected speech; rather, the plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (stating that a retaliation claim cannot rest on "the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore because of this'"). Therefore, although the timing of an official's action can constitute circumstantial evidence of retaliation—if, for example, an adverse action was taken shortly after the official learned about the inmate's exercise of protected conduct—there generally must be something more than mere timing to support an inference of retaliatory intent. *Pratt*, 65 F.3d at 808.

Dana broadly alleges that Tewalt, Ramirez, Valley, Christensen, Dietz, McKay, Walton, and Smyth threatened to put her in solitary confinement and take away her feminine items if she called the PREA hotline. Her allegations are sufficient to establish a plausible retaliation claim as to the Smyth, the only individual she specifically identified being associated with the threat. Dana may proceed with a retaliation claim against Smyth. However, because she failed to allege facts that specifically name Tewalt, Ramirez, Valley,

Christensen, Dietz, McKay, or Walton, or tie them to the threats in any meaningful way, Dana's Eighth Claim of Relation is dismissed against Tewalt, Ramirez, Valley, Christensen, Dietz, McKay, and Walton without prejudice.

i.   <u>Claims Nine, Ten, and Eleven: Idaho State Law Negligence Claims</u>

Dana brings her Ninth, Tenth, and Eleventh Claims against all Defendants except IDOC. Dkt. 30, at 26. All three are state law claims. The Court will address each briefly in turn.

(i)   *Claims Nine and Ten: Negligence and Negligent Infliction of Emotional Distress*

Dana's Ninth and Tenth Claims are negligence claims under Idaho State Law—claims for negligence and negligent infliction of emotional distress, respectively. Dkt. 30 at 26–27.

In a negligence action under Idaho law, "the plaintiff must establish the following elements: '(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage.'" *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011) (quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)). A plaintiff asserting a medical malpractice claim also must submit the claim to a prelitigation screening panel in accordance with Idaho Code § 6-1001.

Dana alleges Defendants acted negligently in failing to comply with professional standards in the treatment, care, and supervision of Dana during her incarcerations at ISCI. Dkt. 30, ¶ 122. Dana also alleges that Defendants' failure to comply with professional

standards resulted in the negligent infliction of emotional distress. Dkt. 30, ¶ 122.

Defendants contend that Dana's failure to allege, or factually support, that any individual Defendant had a duty, how that duty was breached, or how the breach was the proximate cause of any injury renders her claim insufficient. Dkt. 57-1, at 19. The Court agrees. Dana has only broadly touched upon the elements of negligence and negligent infliction of emotional distress and recited conclusory allegations. Sufficient facts have not been plead to support this claim and both must, therefore, be dismissed.

*(ii)    Claim Eleven: Intentional Infliction of Emotional Distress*

Dana's Eleventh Claim is for intentional infliction of emotional distress ("IIED") claim. Dana alleges that Defendants deliberately and intentionally: withheld necessary medical treatment; punished Dana for living as a woman; refused to acknowledge the general dysphoria diagnosis of Dana's expert; refused to render a diagnosis of GD; refused to provide Dana hormone treatment therapy; and, in their supervisory capacity, allowed inadequate medical care and treatment to be provided to Dana. Dkt. 30, ¶¶ 134, 135, 137.

To recover on a claim of intentional infliction of emotional distress ("IIED"), the plaintiff must show that: (1) the defendant's conduct was intentional or reckless, (2) the conduct was extreme and outrageous, (3) there was a causal connection between the conduct and the emotional distress, and (4) the emotional distress was severe. *Bollinger v. Fall River Rural Elec. Co-op., Inc.*, 272 P.3d 1263, 1274 (Idaho 2012) (citing *Nation v. State Dep't of Correction*, 158 P.3d 953, 968 (Idaho 2007)). To support an IIED claim, conduct must be more than merely "unjustifiable," but rather must rise to the level of

"atrocious" behavior "beyond all possible bounds of decency." *Id.* (citing *Edmondson v. Shearer Lumber Prod.*, 75 P.3d 733, 741 (Idaho 2003)).

It is unclear from the First Amended Complaint what conduct any Defendant individually engaged in that would give rise to an IIED claim.[15] It is also unclear what role, if any, Defendants had in the alleged withholding of medical treatment and GD diagnosis. Furthermore, Dana does not claim that any of the alleged conduct was extreme and outrageous.[16]

More importantly, however, regardless of Dana's insufficient pleading on these three claims, Defendants are entitled to statutory immunity under the circumstances presented here.

### (iii)    Immunity

Idaho Code section 6-904 outlines that:

> A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent and without gross negligence or reckless, willful and wanton conduct . . . shall not be liable for any claim which: . . .
>
> 5. Arises out of any act or omission providing or failing to provide medical care to a prisoner or person in the custody of any city, county or state jail, detention center or correctional facility.

---

[15] As with all of Dana's Claims throughout her First Amended Complaint, Claim Eleven is very general. Not once in Claim Eleven does Dana name any individual defendant or identify what conduct any individual defendant engaged in that allegedly caused her harm or emotional distress.

[16] Fundamentally, the Court disagrees with Dana that IDOC's decision to rely on Dr. Campbell's conclusion that Dana did not warrant a GD diagnosis is extreme and outrageous conduct. Its reliance on competent medical information is *at most* negligence—assuming some error in Dr. Campbell's analysis—but regardless, does not rise to the level necessary to support these negligence claims.

Idaho Code § 6-904(B)(5).

Idaho Code § 6-904A(2) further states that governmental entities and employees while acting within the course and scope of their employment and without malice or criminal intent and without reckless, willful and wonton conduct, shall not be liable for any claim which: "[a]rises out of injury to a person or property by a person under supervision, custody or care of a governmental entity . . . ." Under both of these statutes, Defendants are immune from suit.

Dana argues that her First Amended Complaint sufficiently alleges that Defendants exhibited "reckless, willful, and wonton conduct," in their failure to diagnose, treat, and protect Dana, Dkt. 69 at 18, and that this behavior is sufficient to support claims Nine, Then, and Eleven. The Court disagrees. Simply stating that Defendants acted that way— recklessly, willfully, and with wanton conduct—without more, is insufficient to support any of the asserted claims or overcome the applicable immunity statutes. Unless and until Dana can identify individual Defendants and provide specific instances where Defendants exhibited "reckless, willful, and wonton conduct," this claim must be dismissed.

j.  <u>Claim Twelve: Battery</u>

Dana's Twelfth Claim—Battery—is brought solely against Defendant Evancho. As explained in more detail above,[17] Dana alleges that on one occasion, Evancho cuffed her arms behind her back when escorting her from her cell and forcefully shoved her down a walkway. Dkt. 30, ¶ 141. Defendants argue that Dana cannot make out a prima facie case

---

[17] *See* Section III(A)(2)(b).

against Defendant Evancho for battery because the alleged contact was permitted—as officers are permitted to have contact with inmates when escorting them to their cells.[18] Dkt. 57-1, at 20. Defendants also argue that Evancho has statutory immunity for this claim. *Id.* In response, Dana simply asserts that her First Amended Complaint alleges that Evancho acted with malicious intent—thus superseding immunity. Dkt. 69, at 18.

Idaho Code section 6-904 instructs that governmental entities and employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which: "[a]rises out of assault [or] battery . . . ." Idaho Code § 6-904(3). Similar to Dana's claim against Evancho for excessive force, beyond Dana's formulaic recitation of the elements that would exempt Evancho from statutory immunity, there is nothing in the First Amended Complaint that suggests Evancho actually acted maliciously or with criminal intent while escorting Dana from her cell.

Without sufficient facts to show that Evancho acted with criminal intent, he is entitled to immunity. Dana's claim for battery against Defendant Evancho must, therefore, be dismissed.

### 3.   *Analysis of Corizon's Motion*

In its motion to dismiss, Corizon argues that it must be dismissed from this case because Dana has—once again—failed to make any specific factual allegations against it.

---

[18] Battery requires intentional bodily contact that is either harmful or offensive. *White v. Univ. of Idaho*, 768 P.2d 827, 828 (Idaho Ct. App. 1989), aff'd, 118 Idaho 400, 797 P.2d 108 (1990) (internal citations omitted). "The intent element of the tort of battery does not require a desire or purpose to bring about a specific result or injury; it is satisfied if the actor's affirmative act causes an intended contact which is unpermitted and which is harmful or offensive." *Id.* (citing *Rajspic v. National Mutual Ins. Co.*, P.2d 1167 (Idaho 1986)).

Dkt. 39-1, at 2.

Judge Winmill previously dismissed Dana's claims against Corizon because Dana failed to allege "specific facts giving rise to a reasonable inference that she was denied appropriate gender dysphoria treatment based on a policy, custom, or practice of Corizon." Dkt. 8, at 15. Similar to Judge Winmill's previous finding, the Court today finds that Dana has not alleged sufficient facts to put Corizon on notice of any claims against it.

In her Amended Complaint, Dana lists Corizon three times in the background section (for context), eight times at the conclusion of various claims (grouped with all Defendants for damages),[19] and once in the heading of her sixth cause of action for ADA discrimination.

Those references aside, Dana's Complaint is otherwise void of any specific facts or allegations outlining how Corizon—as a whole, or any individual Corizon employee—is involved in the circumstances giving rise to the claims at issue in this case. Critically, Dana does not mention any policy, custom, or practice of Corizon's that would apply to her claims. This is specifically the deficiency Judge Winmill identified in his prior order.

In response, Dana asserts that contrary to Corizon's assertions, she has in fact "clearly allege[d] the actions that violated her rights, and Corizon, as the only outside agency providing medical care to Ms. Dana, should unquestionably be able to determine which claims and allegations are directed towards it." Dkt. 42, at 5.

---

[19] Dana states that "an award of punitive and exemplary damages against Individual Defendants *and Corizon*, in an amount to be determined at trial, is also justified." Dkt. 30, at 18, 20, 22, 24, 28, 29, 30, 31 (emphasis added).

This assertion is severely flawed. It is not a defendant's burden to surmise what claims are "directed towards it" but a plaintiff's responsibility to provide specific underlying facts that will give a defendant "fair notice" of the accusations it must defend against. *See Starr*, 652 F.3d at 1216; *Twombly*, 550 U.S. at 555.

Dana emphasizes that she has incorporated the facts "by reference" and that these "identify the relationship between Ms. Dana and Corizon." Dkt. 42, at 16. Dana also points to specific paragraphs in her Complaint as examples of the "breaches committed by Corizon." *Id.* The Court has written extensively on the issue of incorporation,[20] but even were the Court to "incorporate" the paragraphs Dana references into the various claims, it is still virtually impossible to determine what, if anything, any employee of Corizon did or did not do in this case.

What scant information there is about Corizon is vague, conclusory, and typically lumped together with the behavior of other defendants. This type of "group pleading" is insufficient to put Corizon on notice of what it must defend. *See e.g., Medina v. Bauer*, No. 02 CIV. 8837(DC), 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) ("By lumping all the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8. Specifically, the allegations fail to give adequate notice to these defendants as to what they [allegedly] did wrong.").

---

[20] As the Court has explained before, under the principle of incorporation, allegations in one area of a Complaint that support the individual causes of action (even if not reiterated in each cause of action) are sufficient under *Iqbal* and *Twombly. See Sagastume v. RG Transportation, Inc.*, No. 4:18-CV-00361-DCN, 2019 WL 2218986, at *8 (D. Idaho May 21, 2019) (finding that while the plaintiff had not stated a particular fact in a certain section of his complaint, this omission did not warrant dismissal of that claim as those facts were stated elsewhere and the plaintiff had incorporated those paragraphs in the relevant section).

While Dana may have identified that a *relationship* exists between herself and Corizon, that alone, is insufficient. Longstanding caselaw, the judicial rules (e.g., Federal Rule of Civil Procedure 8), and this Court, require specific factual allegations—none of which are found in Dana's Amended Complaint.

Upon review, the Court will grant Corizon's motion to dismiss as Dana has failed to allege sufficient facts to support any of her claims. And while the Court will allow Dana an opportunity to file a motion for leave to amend on the claims identified above against the remaining Defendants, the Court finds no need to allow such an opportunity here, as Dana has already had two opportunities and was unable to meet her burden.[21] Corizon is dismissed as a Defendant in this case.

### 4.    *Summary of Defendants' Motions to Dismiss*

While some claims outlined above include more facts than others (Claims One–Three for example), the facts—even as currently written—do not rise to the level necessary to support essentially all of Dana's claims. More problematic, however, is that many of the other claims do not even have the facts necessary to identify the relevant players and actions that took place. Still others appear legally foreclosed (the ADA claim for example in light of the *Simmons* case). But again, the Court cannot fully evaluate any legal barriers

---

[21] Said differently, as explained above, Dana's Amended Complaint—as it relates to the other Defendants—is better in some respects and worse in some respects than her original Complaint. This generally warrants Dana one final chance to clarify and provide factual support for the claims at issue. As for Corizon, however, Dana has already had that opportunity and failed to meet the requisite standard. The Court believes were it to allow Dana an opportunity to amend her claims against Corizon, such would be an exercise in futility.

to Dana's causes of action because it does not know the factual basis underlying those claims.

Critically, the bulk of Dana's complaint focuses on Defendants actions in *not* diagnosing her with GD. She now has that diagnosis. This shifts the focus, to some degree, from claims that Defendants "are not providing [certain treatment]" to Defendants "did not provide [certain treatment]." However, as written, it is difficult to determine if those actions—now remedied—still violate Dana's rights. Although this is not a new case by any means, Dana must re-evaluate her claims and amend any that are still viable to include sufficient factual details to support each one. Dana must carefully determine whether sufficient facts exist before she realleges any claim.[22] Furthermore, no new claims will be allowed at this stage.[23]

Leave to amend pleadings shall be freely given when justice so requires. Fed. R. Civ. P. 15(a). Courts apply Rule 15 with extreme liberality. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citations omitted). "A dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Krainski v. Nevada ex rel. Bd. of Regents,* 616 F.3d 963 (9th Cir. 2010). The Ninth Circuit has held that "in dismissals for failure to state a claim, a district

---

[22] For example, the Court's position on Claims Nine, Ten, and Eleven is fairly clear. It is extremely unlikely that Dana could meet the high burden necessary in order to overcome statutory immunity. That said, the Court does not actually know this because it does not have any facts before it—just Dana's claim that Defendants exhibited "reckless, willful, and wonton conduct." Dkt. 69, at 18. If Dana feels that these Claims are viable, she must outline specific conduct that could plausibly meet the appropriate standard.

[23] Again, if at a later point Dana determines there is a basis for other claims, she can move the Court for an opportunity to amend.

court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Service, Inc.,* 911 F.2d 242, 247 (9th Cir. 1990).

The issue is not whether plaintiff will prevail but whether she "is entitled to offer evidence to support the claims." *See Hydrick v. Hunter,* 466 F.3d 676, 685 (9th Cir. 2006). In determining whether a motion to amend should be granted, the court generally considers five factors: (1) undue delay; (2) bad faith; (3) futility of amendment; (4) prejudice to the opposing party; and (5) whether the plaintiff has previously amended the complaint. *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011) (citation omitted). These factors are not weighted equally: futility of amendment alone can justify the denial of a motion to amend. *Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009).

The Court cannot say, as a matter of law, that Dana's claims against the State Defendants cannot be saved by amendment.[24] Accordingly, the Court will grant her a final opportunity to *ask* for leave to amend. However, Dana is cautioned that "[l]eave to amend may . . . be denied for *repeated* failure to cure deficiencies by previous amendment." *Abagninin v. AMVAC Chem. Corp.,* 545 F.3d 733, 742 (9th Cir. 2008) (citations omitted) (emphasis added).

---

[24] As noted above, Dana's claims against Corizon must be dismissed with prejudice. Dana has had two full and fair opportunities to alleges claims against Corizon and has failed to do so. Dana will not be allowed to amend her complaint as to Corizon.

Because two federal judges have already reviewed Dana's claims, the Court will not give Dana leave to amend as a matter of right. Instead, Dana must petition for leave to amend her complaint. In that motion, Dana must clearly articulate how she has remedied the concerns raised in this decision. Furthermore, Pursuant to District of Idaho Local Rule 15.1, Dana must include a proposed amended complaint with any such motion. In this manner, the Court (and opposing counsel) will be able to see and review the proposed changes. Instead of filing a Motion to Dismiss, Defendants will be allowed to respond to Dana's Motion for Leave to Amend. The Court will then determine if Dana has alleged sufficient facts to support the proposed amendments. This will save time and resources. Fed. R. Civ. P. 1.

**B. Dana's Preliminary Injunction**

As has already been mentioned, the posture of this case is extremely awkward. The preliminary injunction only applies to Adkisson and Tewalt—the two Defendants who were parties when the preliminary injunction was filed. That said, by nature of the Court's decision today, those Defendants are dismissed, pending leave to amend.

To some degree then, this motion is improper or moot as there are no parties currently involved in the case to which it would apply. That said, *when filed,* the parties at issue would have had the authority or ability to address Dana's concerns. Because of the posture of this case, the Court will, nonetheless, address the motion.

More importantly, due to changed circumstances, regardless of whether the motion is procedurally moot, it is also moot on the merits.

*1. Legal Standard*

A Plaintiff seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (internal citations omitted).

The basic function of a preliminary injunction is to "preserve the status quo ante litem pending a determination of the action on the merits." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). A preliminary injunction should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The Court will address each of the necessary elements for a preliminary injunction in turn.

*2. Analysis*

In her original motion for preliminary injunction, as well as her supplement, Dana asks the Court for the following relief:

(1) ordering Defendants to provide her immediate access to necessary medical treatment, including
    (a) acknowledging the gender dysphoria diagnosis of Ms. Dana's expert, Dr. Ettner and/or rendering its own diagnosis of gender dysphoria;
    (b) hormone treatment therapy;
    (c) access to gender-appropriate underwear, clothing, and commissary items; (d) any other treatment a medical professional qualified to assess and treat gender dysphoria determines to be medically urgent; and

(2) prohibiting Defendants from disciplining or retaliating against Ms. Dana for expressing her gender identity, including wearing gender-appropriate underwear and clothing, and adhering to female grooming standards with respect to makeup and hair styling.

Dkt. 24, at 8 (reformatted for readability).

As has already been mentioned, recent events materially affect this motion.

On October 2, 2019, IDOC's Chief Psychologist, Dr. Campbell, completed a re-evaluation of Dana for GD pursuant to IDOC policy and at Watson's request. Dkt. 75-1, at ¶ 6. Dr. Campbell concluded as part of his re-evaluation that a GD diagnosis for Dana was appropriate at this time. Dkt. 75-1, ¶ 6. Dr. Campbell still holds looming concerns regarding Dana's personal history, the source of Dana's distress, and the interplay of multiple medical conditions—such as borderline personality disorder—and GD, but nonetheless determined that a GD diagnosis was appropriate for Dana. Dkt. 75-2, at 5.

On October 2, 2019, the MTC met and affirmed Dana's diagnosis of GD. Dkt. 75-1, ¶ 7.

On October 3, 2019, Watson met with Dana. Dana explained that she was pleased with the GD diagnosis. Dkt. 75-1, at 10. Dana further denied any suicidal ideations or desires to commit self-harm. *Id.* Watson and Dana then completed an updated treatment plan regarding Dana's new GD diagnosis. *Id.*; Dkt. 75-11.

On October 5, 2019, Dana requested a consult to begin Hormone Replacement Therapy (HRT). Dkt. 75-1, at ¶ 11. Dana has since met with Dr. Marvin Alviso, an HRT specialist located in Boise. Dkt. 77.

In light of her GD diagnosis, Dana is now permitted by IDOC policy to "maintain

[her] appearance in a way that is consistent with [her] identified gender" and purchase female items from commissary including, but not limited to, female undergarments, makeup, and curling irons. Dkt. 75-1, ¶ 12. Since October 2, 2019, it appears Dana has successfully purchased female commissary items including mascara and a curling iron. *Id.*

Dana was also enrolled in the mental health GD process group and has attended the group on several occasions. Dkt. 75-1, ¶ 13.

In light of these developments, it is difficult to find as a matter of law that a preliminary injunction is necessary as the requested relief has, for all intents and purposes, been obtained. Specifically, it is unlikely Dana could prove irreparable harm considering the purported reason for her self-harm was a lack of GD diagnoses—which she now has.

Taking a step back, however, not only would it be difficult for Dana to show any harm at this point, but because IDOC has remedied Dana's underlying requests, she likely does not have standing to request this type of relief in the first place.

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 408 (2013). Accordingly, the standing inquiry is "rigorous" and the plaintiff must show that the alleged future injury is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* at 1147 (emphasis added). Thus, the Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of possible future injury' are not

sufficient." *Clapper*, at 1147 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1999) (alterations in original)).

Critically, "[p]ast exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects. Nor does speculation or 'subjective apprehension' about future harm support standing." *Munns v. Kerry*, 782 F.3d 402 (9th Cir. 2015) (quoting *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010)). "Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces 'real or immediate threat . . . that he will again be wronged in a similar way." *Mayfield*, 599 F.3d at 970 (9th Cir. 2010) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). As recognized by the Ninth Circuit, a case is moot when the court can no longer grant the relief the party requested. *NASD Dispute Resolution, Inc. v. Judicial council of State of Cal.*, 488 F.3d 1065, 1068 (9th Cir. 2007).

Here, it is clear Dana has been provided the relief she sought in her injunctive motion. Said differently, there is nothing for the Court to order. Dana appears—in part—to recognize this.

In her supplemental brief, Dana acknowledges that IDOC has diagnosed her with GD but asserts that diagnosis was "a small part of the comprehensive relief" she sought in her preliminary injunction. Dkt. 74, at 7. Specifically, Dana was concerned at the time of her supplemental filing that she would not get the hormone therapy she desires and/or that the relief she has been provided will not be "lasting, meaningful, and non-illusory." *Id.* In short, Dana is concerned that Dr. Campbell's GD diagnosis was a farce or that IDOC might

"arbitrarily reverse her gender dysphoria diagnosis without going through a *court-approved process* and finding of good-cause." Dkt. 74, at 8 (emphasis added).

As a threshold matter, the idea that the court would approve any process related to IDOC's medical diagnostic procedures is inappropriate. The Court can advise that IDOC should follow its standard policies and procedures—as well as all applicable state and federal laws—but it will not inject itself in a medical and penological process in has no part in. More importantly, Dana's concerns about the legitimacy of her GD diagnosis is a matter the Court cannot rule on at this time. Absent a live case or controversy, the Court is divested of its jurisdiction.

The Court turns to Dana's specific concerns.

First, Dana's concern that she would not get the desired hormone therapy is moot. Since filing her supplemental brief, she has met with appropriate treatment providers and begun hormone therapy.

Second, if violations do reoccur—or Dana questions the GD-related care she receives—the legal system will be available to her *at that time* to prosecute her claims.

Finally, Dana's concern that her GD diagnosis would be revoked seems particularly far-fetched. In her declaration, Watson states that she is not "aware of any reasons to suggest even a remote possibility that Ms. Dana's diagnosis of GD will be involuntarily revoked at any time during the remainder of Ms. Dana's incarceration with IDOC." Dkt. 75-1, ¶ 14. Watson also states that she is personally aware of approximately 40 inmates who have received or maintained a GD diagnosis while in IDOC custody and that not a

single one of those inmate's GD diagnosis has been revoked. *Id.*

For all these reasons, the Court finds there is no live case or controversy that needs to preliminarily be enjoined. The motion for preliminary injunction must, therefore, be DENIED as MOOT.

### IV. ORDER

1. Dana's Motion for Preliminary Injunction (Dkt. 24) is DENIED as MOOT.

2. Corizon's Motion to Dismiss (Dkt. 39) is GRANTED. Corizon is dismissed as a Defendant from this case WITH PREJUDICE. Dana will not be allowed to amend her claims against Corizon.

3. Defendant Adkisson and Tewalt's Motion to Dismiss (Dkt. 32) is GRANTED.

4. Remaining State Defendants' Motion to Dismiss (Dkt. 57) is GRANTED in PART and DENIED in PART. Dana may proceed with her Eighth cause of action against Defendant Smyth.

5. Should Dana wish to amend her Complaint (against any Defendant other than Corizon) to comply with the Court's above analysis, she may file a Motion for Leave to Amend Complaint identifying precisely how her proposed amended complaint complies with the Court's order. Any such motion shall be filed within 60 days of the date of this order. Discovery (on the claim against Smyth) shall not begin until the Court has ruled on any Motion for Leave to Amend. Once filed, Defendants may respond to Dana's Motion, if they so desire, within 21 days. Dana may file her reply, if any, within 14 days. The Court will then determine which claims have been

sufficiently pled and may proceed and which have not and will be dismissed with prejudice.

6. Dana's Supplemental Motion (Dkt. 46) is DENIED as MOOT.

7. Dana's Motion to Supplement (Dkt. 59) is GRANTED. Dana filed this document at the Court's request. It need not have been filed as a motion, but insofar as it was, the Court grants and accepts the same.

DATED: April 1, 2020

David C. Nye
Chief U.S. District Court Judge