# EXHIBIT A

SETH D. LEVY (ID SBN 10703)
slevy@nixonpeabody.com
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA  90071-3151
Telephone: (213) 629-6000
Facsimile:  (213) 629-6009

FREDRIC C. NELSON (CA SBN 48402) (admitted *pro hac vice*)
fnelson@nixonpeabody.com
MATTHEW A. RICHARDS (CA SBN 233166) (admitted *pro hac vice*)
mrichards@nixonpeabody.com
CONOR C. MCNAMARA (CA SBN 319238) (admitted *pro hac vice*)
cmcnamara@nixonpeabody.com
NIXON PEABODY LLP
One Embarcadero Center, 32nd Floor
San Francisco, CA  94111-3600
Telephone: (415) 984-8200
Facsimile:  (415) 984-8300

*Attorneys for Plaintiff Larry Dana*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LARRY DANA,<br><br>Plaintiff,<br><br>vs.<br><br>IDAHO DEPARTMENT OF CORRECTION; JOSH TEWALT, in his official capacity; BREE DERRICK, in her official capacity; AL RAMIREZ, in his official capacity; RANDY VALLEY, in his official capacity; JAY CHRISTENSEN, in his official capacity; DAVE DIETZ, in his official capacity, TIM McKAY in his official capacity; WALTER CAMPBELL, PhD; RONA SIEGERT; ELIZABETH ADKISSON; KRINA STEWART; BREONNA KRAFFT; ADREA NICODEMUS; JANELL CLEMENT; SCOTT ELIASON, MD; MORGAN HAHN; LAURA WATSON; KAYLENE HARTT; | Case No. 1:18-cv-00298-DCN<br><br>**SECOND AMENDED COMPLAINT**<br><br>1.   Failure to Provide Medical Treatment (8th Amendment)<br>2.   Excessive Force (8th Amendment)<br>3.   Failure to Protect from Harm (8th Amendment)<br>4.   Violation of Equal Protection – Sex (14th Amendment)<br>5.   Violation of Equal Protection – Diagnosis (14th Amendment)<br>6.   Discrimination in Violation of Americans with Disabilities Act/Rehabilitation Act<br>7.   Discrimination in Violation of Affordable Care Act<br>8.   Retaliation (1st Amendment) |

4841-3651-4492.3

| | |
|---|---|
| STEVEN MENARD, MD; BRYAN GIMMESON; SHELLIE MUNOZ; JEREMY CLARK; JOSIE BOGGS; JANELLE MYERS; CHRIS BENNETT; NICK WISE; EMMA HARTT; IDA LE; AMBER MICKELSON; SAMUEL PIERSON; ROBERT GRANT; C/O EVANCHO; C/O WALTON; C/O SMYTH; C/O TAYLOR; and DOES 1-15; | [DEMAND FOR JURY TRIAL] |
| Defendants. | |

## INTRODUCTION

1.       Plaintiff Kay Dana, f/k/a Larry Dana ("Dana") is currently incarcerated by the Idaho Department of Corrections ("IDOC") in the Idaho State Correctional Institution ("ISCI") in Kuna, Idaho. Ms. Dana has been incarcerated since May 2017. Ms. Dana is a transgender woman—an individual whose gender identity (female) is different from the male gender assigned to her at birth.[1] Furthermore, for much of her life Ms. Dana has struggled with gender dysphoria, a serious medical condition characterized by strong cross-gender identification, and strong and persistent discomfort about one's assigned sex. As a result of her gender dysphoria, Ms. Dana experiences severe dysphoria and distress resulting from the incongruence between her male physical features and her female gender identity. She requires medically necessary care to treat gender dysphoria. Despite this, and despite Ms. Dana's repeated requests for a gender dysphoria diagnosis both directly to the clinicians and clinical supervisor with whom she regularly met, and through IDOC's Health Service Request ("HSR") forms, Grievance Forms, and appeals procedures, she was denied a gender dysphoria diagnosis by members of the Management and Treatment Committee ("MTC")—the IDOC committee responsible for making such determinations that includes senior prison officials and IDOC, ISCI, ISCC, and Corizon employees—from the beginning of her incarceration in May 2017 until a sudden

---

[1] At birth, infants are classified as male or female based on a visual observation of their external genitalia. This classification becomes the person's "sex assigned at birth," but may not be the same as the person's sex/gender identity.

change of position by the MTC in October 2019—in the course of this litigation, and while

facing a pending motion for injunctive relief.

2.      Ms. Dana was arbitrarily and capriciously denied a gender dysphoria diagnosis

for nearly *two and a half years* by IDOC and members of the MTC—many of whom are not

medical professionals—for reasons unrelated to the clinical criteria for assessing gender

dysphoria, such as perceived malingering or personality disorders—neither of which is

recognized as a medically valid basis to withhold a gender dysphoria diagnosis. In fact, the

MTC's decision-making appears to have been rooted either in the ignorance of the medical

standards for diagnosing gender dysphoria or personal animus or prejudice against Ms. Dana.

3.      During those nearly two and a half years, IDOC and the MTC defendants

systematically deprived Ms. Dana of access to life-saving hormone replacement therapy and

other treatments made available to transgender inmates with a gender dysphoria diagnosis,

despite knowledge that she had attempted suicide and was considered a suicide risk—both

hallmarks of untreated gender dysphoria—despite repeated medical requests, grievances, and

appeals by Ms. Dana herself; despite requests through counsel that IDOC and the MTC

defendants reconsider their prior decisions and make the life-saving hormone replacement

therapy available to Ms. Dana; and despite an evaluation and report provided to all defendants

in this case in May 2019 by Dr. Randi Ettner, a pre-eminent expert in the field of gender

dysphoria, in which the risk of suicide was documented and hormone replacement therapy was

recommended. Even after having Dr. Ettner's report in hand, nearly six months elapsed before

IDOC and the MTC defendants finally did the right thing and reversed their plainly incorrect

and non-science-based refusal to diagnosis Ms. Dana with gender dysphoria. The only changed

circumstances during that time were external—the pending motion for injunctive relief in this

case.

4.      The most common forms of treatment for gender dysphoria are counseling, the

"real-life" experience of living full-time within the desired gender, hormonal therapy, and sex

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

4841-3651-4492.3

affirming surgeries that conform primary or secondary sex characteristics with gender identity. Because gender dysphoria is not a mental disorder, counseling is aimed at providing coping mechanisms to deal with the discrimination and bias that transgender people typically experience from other people or institutions.

5.      Prior to being incarcerated, Ms. Dana lived full-time as a woman while with her family and close friends, but continued to live as a man at work in order to avoid conflict and to maintain job security. Since becoming incarcerated with IDOC, Ms. Dana has sought appropriate medical treatment, including access to feminizing hormones, evaluation for sex affirming surgery, and the ability to live as a woman while incarcerated. However, IDOC and the MTC defendants refused to allow Ms. Dana to access medically necessary treatment for nearly two and a half years, and they and other defendants have repeatedly antagonized, retaliated against, or punished Ms. Dana for expressing her gender identity, including subjecting her to solitary confinement.

6.      Defendants' denial of necessary medical treatment as well as disciplining and punishing Ms. Dana for expressing her gender identity have caused grave and unnecessary suffering and harm to Ms. Dana, including a suicide attempt and continuous thoughts of self-castration.

7.      Defendants' actions violate: the Eighth Amendment to the U.S. Constitution's prohibition on cruel and unusual punishment by denying Ms. Dana necessary medical treatment, subjecting her to excessive force, and failing to protect her from harm; the Fourteenth Amendment to the U.S. Constitution's guarantee of equal protection by discriminating against her based on sex, sex stereotyping, and/or gender identity as well as based on the refusal to acknowledge the diagnosis of gender dysphoria; the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by discriminating against her in provision of medical treatment and participation in programs and services; the non-discrimination provision of the Affordable Care Act by discriminating based on sex, sex

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

stereotyping, and/or gender identity; and the First Amendment to the U.S. Constitution's prohibition on abridging the freedom of speech by retaliating against her for using the Prison Rape Elimination Act ("PREA") Hotline.

8.      Ms. Dana seeks injunctive and declaratory relief and damages, including punitive damages, for Defendants' violations of her rights and other wrongdoing.

## JURISDICTION AND VENUE

9.      Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, the Eighth, Fourteenth and First Amendments of the U.S. Constitution, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.SC. § 794a, and Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff seeks declaratory and injunctive relief and damages for Defendants' violation of Plaintiff's civil rights.

10.     Venue is appropriate in the District of Idaho pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

11.     Plaintiff has exhausted all administrative remedies with respect to the claims contained herein.

## PARTIES

12.     **Plaintiff** is a 47-year old transgender woman and a United States citizen. She is currently housed at the ISCI in Kuna, Idaho. Plaintiff has been incarcerated in the custody of IDOC since May 2017.

13.     Defendant IDOC is the State agency responsible for incarceration of adult inmates sentenced by the courts. IDOC operates correctional facilities in Idaho, including ISCI where Plaintiff is housed.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

4841-3651-4492.3

14.     Defendant Josh Tewalt is the current Director of the Idaho Department of Correction.[2] As Director, Defendant Tewalt is the highest-level official in IDOC and is responsible for administering and overseeing the operations of IDOC, including the policies, procedures, and practices followed by IDOC, its contractors, employees, and agents. On information and belief, Defendant Tewalt is also the final reviewer of treatment decisions made by IDOC's Management and Treatment Committee ("MTC"), a committee comprised of both medical professionals and non-medical members created by IDOC to review inmate treatment plans and make determinations regarding medical treatment decisions. Mr. Tewalt is sued in his official capacity.

15.     Defendant Bree Derrick is the current Deputy Director of the Idaho Department of Correction.[3] As Deputy Director, Defendant Derrick is a member of IDOC's executive leadership team, and is specifically charged by IDOC policy to oversee implementation of health care services and treatment in IDOC including the development and implementation of standard operating procedures to effectuate health care delivery. Ms. Derrick is sued in her official capacity.

16.     Defendant Al Ramirez is the current Warden of ISCI where Plaintiff is housed. As Warden, Defendant Ramirez is responsible for oversight of operations at ISCI, implementation of IDOC policies and procedures, staff training, welfare of inmates housed at the ISCI, and is the supervisor of all other individual Defendants employed at ISCI. Mr. Ramirez is sued in his official capacity.

---

[2] Plaintiff originally named Henry Atencio, who was then Director of IDOC. Since Plaintiff filed her suit, Mr. Tewalt has been appointed Director and is automatically substituted as a party in his official capacity. Fed. R. Civ. P. 25(d).
[3] Plaintiff originally named Jeff Zmuda, who was then Deputy Director of IDOC. Since Plaintiff filed her suit, Ms. Derrick has been appointed Director and is automatically substituted as a party in her official capacity. Fed. R. Civ. P. 25(d).

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

4841-3651-4492.3

17.     Defendant Randy Valley is the current Deputy Warden of ISCI where Plaintiff is housed. As Deputy Warden, Defendant Valley is responsible for oversight of operations at ISCI, implementation of IDOC policies and procedures, staff training, welfare of inmates housed at the ISCI, and is the supervisor of all other individual Defendants employed at ISCI. Defendant Valley is a non-medical member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years. Mr. Valley is sued in his official capacity.

18.     Defendant Jay Christensen is the current Warden of the Idaho State Correctional Center ("ISCC") where Plaintiff was housed. As Warden, Defendant Christensen is responsible for oversight of operations at ISCC, implementation of IDOC policies and procedures, staff training, welfare of inmates housed at the ISCC, and is the supervisor of all other individual Defendants employed at ISCC. Defendant Christensen is a non-medical member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years. Mr. Christensen is sued in his official capacity.

19.     Defendant Dave Dietz is the current Deputy Warden of the ISCC where Plaintiff was housed. As Deputy Warden, Defendant Dietz is responsible for oversight of operations at ISCC, implementation of IDOC policies and procedures, staff training, welfare of inmates housed at the ISCC, and is the supervisor of all other individual Defendants employed at ISCC. Defendant Dietz is a non-medical member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years. Mr. Dietz is sued in his official capacity.

20.     Defendant Tim McKay is the current Deputy Warden of Operations at ISCC where Plaintiff was housed. As Deputy Warden of Operations, Defendant McKay is responsible for oversight of operations at ISCC, implementation of IDOC policies and procedures, staff training, welfare of inmates housed at the ISCC, and is the supervisor of all other individual Defendants employed at ISCC. Defendant McKay is a non-medical member of IDOC's MTC

7

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years. Mr. McKay is sued in his official capacity.

21.     Defendant Walter Campbell is and was at all times relevant to the actions and omissions described herein the Chief Psychologist at ISCI and engaged to provide medical services to inmates housed therein. Defendant Campbell is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years. IDOC records show that Ms. Dana also directly interacted Defendant Campbell, and Ms. Dana requested a gender dysphoria diagnosis directly from him.

22.     Defendant Rona Siegert is and was at all times relevant to the actions and omissions described herein the IDOC Healthcare Director and engaged to provide medical services to inmates housed therein. Defendant Siegert is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

23.     Defendant Elizabeth Adkisson is and was at all times relevant to the actions and omissions described herein a Clinician at ISCI and engaged to provide medical services to inmates housed therein. Defendant Adkisson was responsible for ensuring provision of appropriate medical care to Ms. Dana, and participated in the denial of adequate and necessary medical treatment to Ms. Dana for gender dysphoria. IDOC records show that Defendant Adkisson was also one of the Clinicians with whom Ms. Dana directly interacted, and Ms. Dana requested a gender dysphoria diagnosis directly from her.

24.     **Defendant Krina Stewart** is and was at all times relevant to the actions and omissions described herein a Clinician at ISCI and engaged to provide medical services to inmates housed therein. Defendant Stewart is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years. IDOC records show that Defendant Stewart was also one of the Clinicians with

4841-3651-4492.3

whom Ms. Dana directly interacted, and Ms. Dana requested a gender dysphoria diagnosis directly from her.

25.    Defendant Breonna Krafft is and was at all times relevant to the actions and omissions described herein a Clinician at ISCI and engaged to provide medical services to inmates housed therein. Defendant Krafft is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

26.    Defendant Adrea Nicodemus is and was at all times relevant to the actions and omissions described herein a Clinician at Corizon/ISCC and engaged to provide medical services to inmates housed within the IDOC system. Defendant Nicodemus is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years. IDOC records show that Defendant Nicodemus was also one of the Clinicians with whom Ms. Dana directly interacted, and Ms. Dana requested a gender dysphoria diagnosis directly from her.

27.    Defendant Janell Clement is and was at all times relevant to the actions and omissions described herein a Clinical Supervisor at Pocatello Women's Correctional Center ("PWCC") and engaged to provide medical services to inmates housed within the IDOC system. Defendant Clement is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

28.    Defendant Scott Eliason, MD is and was at all times relevant to the actions and omissions described herein a Psychiatrist at Corizon/ISCI and engaged to provide medical services to inmates housed within the IDOC system. Defendant Eliason is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

29.    Defendant Morgan Hahn is and was at all times relevant to the actions and omissions described herein a Clinician at ISCI and engaged to provide medical services to

inmates housed therein. Defendant Hahn is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years. IDOC records show that Defendant Hahn was also one of the Clinicians with whom Ms. Dana directly interacted, and Ms. Dana requested a gender dysphoria diagnosis directly from her.

30.     Defendant Laura Watson is and was at all times relevant to the actions and omissions described herein a Clinical Supervisor at ISCI and engaged to provide medical services to inmates housed therein. Defendant Watson is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years. IDOC records show that Defendant Watson was also one of the Clinicians with whom Ms. Dana directly interacted, and Ms. Dana requested a gender dysphoria diagnosis directly from her.

31.     Defendant Kaylene Hartt is and was at all times relevant to the actions and omissions described herein a Psych Tech at Corizon/ISCC and engaged to provide medical services to inmates housed within the IDOC system. Defendant Kaylene Hartt is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

32.     Defendant Steven Menard, MD is and was at all times relevant to the actions and omissions described herein a Regional Medical Director at Corizon and engaged to provide medical services to inmates housed within the IDOC system. Defendant Menard is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

33.     Defendant Bryan Gimmeson is and was at all times relevant to the actions and omissions described herein a Clinical Supervisor at Idaho Correctional Institution-Orofino ("ICIO") and engaged to provide medical services to inmates housed within the IDOC system.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

4841-3651-4492.3

Defendant Gimmeson is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

34.     **Defendant Shellie Munoz** is and was at all times relevant to the actions and omissions described herein a Clinician at ICIO and engaged to provide medical services to inmates housed within the IDOC system. Defendant Munoz is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

35.     **Defendant Jeremy Clark** is and was at all times relevant to the actions and omissions described herein a Clinical Supervisor at ISCI and engaged to provide medical services to inmates housed therein. Defendant Clark is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

36.     **Defendant Josie Boggs** is and was at all times relevant to the actions and omissions described herein a Clinician at Idaho Maximum Security Institution ("IMSI") and engaged to provide medical services to inmates housed within the IDOC system. Defendant Boggs is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

37.     **Defendant Janelle Myers** is and was at all times relevant to the actions and omissions described herein a Clinical Supervisor at ISCI and engaged to provide medical services to inmates housed therein. Defendant Myers is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

38.     **Defendant Chris Bennett** is and was at all times relevant to the actions and omissions described herein a Clinician at ISCI and engaged to provide medical services to inmates housed therein. Defendant Bennett is a member of IDOC's MTC that considered Ms.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

39.     **Defendant Nick Wise** is and was at all times relevant to the actions and omissions described herein a Chronic Care Nurse at ISCI and engaged to provide medical services to inmates housed therein. Defendant Wise is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

40.     **Defendant Emma Hartt** is and was at all times relevant to the actions and omissions described herein a Clinician at ISCC and engaged to provide medical services to inmates housed within the IDOC system. Defendant Emma Hartt is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

41.     **Defendant Ida Le** is and was at all times relevant to the actions and omissions described herein a Clinician at ISCC and engaged to provide medical services to inmates housed within the IDOC system. Defendant Le is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

42.     **Defendant Amber Mickelson** is and was at all times relevant to the actions and omissions described herein a Clinician at PWCC and engaged to provide medical services to inmates housed within the IDOC system. Defendant Mickelson is a member of IDOC's MTC that considered Ms. Dana's gender dysphoria evaluations and denied diagnosis and treatment to her for nearly two and a half years.

43.     **Defendant Samuel Pierson** is and was at all times relevant to the actions and omissions described herein a DON at ISCC and engaged to provide medical services to inmates housed within the IDOC system. Defendant Pierson participated in the denial of adequate and necessary medical treatment to Ms. Dana for gender dysphoria.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

4841-3651-4492.3

44.     Defendant Grant Roberts is and was at all times relevant to the actions and omissions described herein an HSA at ISCC and engaged to provide medical services to inmates housed within the IDOC system. Defendant Roberts participated in the denial of adequate and necessary medical treatment to Ms. Dana for gender dysphoria

45.     Defendant Evancho is and was at all times relevant to the actions and omissions described herein a correctional officer with IDOC.

46.     Defendant Walton is and was at all times relevant to the actions and omissions described herein a correctional officer with IDOC.

47.     Defendant Smyth is and was at all times relevant to the actions and omissions described herein a correctional officer with IDOC.

48.     Defendant Taylor is and was at all times relevant to the actions and omissions described herein a correctional officer with IDOC.

49.     DOES 1-10 ("Custodial Does") are additional custody supervisors and officers who were at all times relevant to the actions and omissions described herein employed at ISCI, and responsible for implementation of IDOC policies and procedures, and the welfare of inmates including Plaintiff. Custodial Does supervised and/or participated in the disciplinary actions and denial of Plaintiff's requests complained of herein. At the present time, the identities of Custodial Does are unknown and not discoverable to Plaintiff without the relevant documents for her custody file, to which she does not presently have access. Plaintiff will substitute the true names of Custodial Does when Plaintiff is able to ascertain their identities through discovery.

50.     DOES 11-15 ("Health Care Does") are additional medical providers and staff who were at all times relevant to the actions and omissions described herein engaged to provide medical services at ISCI, and who were responsible for ensuring provision of appropriate medical care to Plaintiff and/or participated in the denial of adequate and necessary medical treatment to Plaintiff for gender dysphoria. Health Care Does further supervised and/or participated in the acts and omissions comprising the basis for Plaintiff's intentional and

13

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

negligent infliction of emotional distress claims. At the present time, the identities of Health Care Does are unknown and not discoverable to Plaintiff without discovery. Plaintiff will substitute the true names of Health Care Does when Plaintiff is able to ascertain their identities through discovery.

51.     Defendants Valley, Christensen, Dietz, McKay, Campbell, Siegert, Stewart, Krafft, Nicodemus, Clement, Eliason, Hahn, Watson, Kaylene Hartt, Menard, Gimmeson, Munoz, Clark, Boggs, Myers, Bennett, Wise, Emma Hartt, Le, and Mickelson are referred to collectively herein as the "MTC Defendants."

52.     Defendants Campbell, Siegert, Adkisson, Stewart, Krafft, Nicodemus, Clement, Eliason, Hahn, Watson, Kaylene Hartt, Menard, Gimmeson, Munoz, Clark, Boggs, Myers, Bennett, Wise, Emma Hartt, Le, Mickelson, Clark, Pierson, and Grant are referred to collectively herein as the "Health Care Defendants."

53.     Defendants Clark, Pierson, Grant, and Siegert are referred to collectively herein as the "Grievance Form Defendants."

54.     Defendants Tewalt, Derrick, Ramirez, Valley, Christensen, Dietz, McKay, Evancho, Walton, Smyth, and Taylor are referred to collectively herein as the "Custodial Defendants."

55.     At all times relevant herein, each Defendant purported to act in the course of his or her employment and under color of state law.

## FACTUAL ALLEGATIONS

### Standards for Diagnosing Gender Dysphoria

56.     The diagnostic criteria for gender dysphoria in adolescents and adults are a marked incongruence between one's experienced/expressed gender and assigned gender, of at least six-months duration, as manifested by at least two of the following:

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

(a)    a marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics);

(b)    a strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced or expressed gender (or in young adolescents, a desire to prevent the development of the anticipated sex characteristics);

(c)    a strong desire for the primary and/or secondary sex characteristics of the other gender;

(d)    a strong desire to be of the other gender (or some alternative gender different from one's assigned gender);

(e)    a strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender); and

(f)    a strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

Furthermore, the condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

### Standards of Care for Treatment of Gender Dysphoria

57.    Gender dysphoria is a serious but diagnosable and treatable *medical* condition recognized by the American Psychiatric Association and codified in the *International Classification of Diseases* (10th revision: World Health Organization) and the *Diagnostic and Statistical Manual of Mental Disorders* Fifth Edition ("DSM-5").

58.    Gender dysphoria is not a *mental* illness or disorder. Rather, "gender dysphoria" is a diagnostic term that refers to clinically significant distress associated with an incongruence or mismatch between a person's gender identity and assigned sex. When gender dysphoria is severe, it can result in a person's inability to function in everyday life. Gender dysphoria is

4841-3651-4492.3

highly treatable. Indeed, with appropriate treatment, individuals with gender dysphoria can be fully cured of all symptoms. When not properly treated, however, gender dysphoria is often associated with dangerous related conditions such as depression, substance abuse, self-mutilation, suicidal ideations, and suicide. Without treatment, the path for those suffering from gender dysphoria can be torturous, as evidenced by alarmingly high suicide attempt rates: 40 percent of persons identifying as transgender attempt suicide, nearly 9 times the national average of 4.6 percent, according to the 2015 National Transgender Discrimination Survey.[4] Ms. Dana's history reflects such effects resulting from inadequate treatment: she has repeatedly experienced suicidal ideation and has engaged in dangerous attempts to self-harm and self-castrate as a response to her despair over her inability to access necessary treatment for her gender dysphoria.

59.     The World Professional Association for Transgender Health ("WPATH") is the leading international organization focused on transgender health care. WPATH has more than 1,000 members throughout the world consisting of physicians, psychiatrists, psychologists, social workers, surgeons, and other health professionals who specialize in the diagnosis and treatment of gender dysphoria. WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care"). The Standards of Care were first developed in 1979. The current version of the Standards of Care, Version 7,[5] was published in September 2011 following a five-year process in which eighteen gender dysphoria specialists submitted peer-reviewed papers to help identify the most effective treatments for gender dysphoria. WPATH's Standards of Care are the prevailing standards of care used by mental health providers and medical professionals treating gender dysphoria.

---

[4] Available at
http://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20-%20FINAL%201.6.17.pdf
[5] Available at
https://s3.amazonaws.com/amo_hub_content/Association140/files/Standards%20of%20Care%20V7%20-%202011%20WPATH%20(2)(1).pdf

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

60.     The WPATH Standards of Care set forth medical treatment options for gender dysphoria and require that a competent medical professional with knowledge and expertise in gender dysphoria evaluate a patient for appropriate and necessary treatment options, which, in addition to living in accord with the person's gender identity, may include hormone therapy, surgery to change primary and/or secondary characteristics, and/or psychotherapy addressing the negative impact of gender dysphoria and stigma on mental health. In promulgating the Standards of Care, the WPATH specifies that they "apply to all transsexual, transgender, and gender nonconforming people, irrespective of housing situation, including in institutional environments such as prisons." The Standards of Care state that "[a]ll elements of assessment and treatment as described in the SOC can be provided to people living in institutions. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care."

**Defendants' Failure to Diagnose, Failure to Provide Necessary Treatment to, and Continued Discrimination Against Ms. Dana**

### *Ms. Dana's Background*

61.     Ms. Dana is a transgender woman who has struggled with gender dysphoria for the majority of her life. Prior to being incarcerated, Ms. Dana lived much of her life as a woman. Ms. Dana has been incarcerated by IDOC since May 2017.

62.     Since she was a young child, Ms. Dana lived full time as a girl with her mother and sister in Tacoma, Washington. Indeed, as a young child Ms. Dana thought that she *was* a girl. She regularly dressed in girls' clothing, engaged in female activities with her sister, and even attended school dressed as a girl. However, when she was in sixth grade, her mother moved the family back to Idaho, and Ms. Dana met her father for the first time. Her father did not approve of Ms. Dana's living as a girl, and forced her to present as a boy in terms of how she

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

dressed and lived. As a result of her father forcing her to live as a boy, Ms. Dana entered a very confusing stage in her life.

63.     Ms. Dana knew that she was different than her male peers, and felt that her male anatomy was wrong. While her mother and sister remained supportive, Ms. Dana was forced to live as a boy in many other areas of her life. During this time, Ms. Dana became overwhelmed by feelings of helplessness due to her father's repeated attempts to change her into something she was not. Eventually, Ms. Dana's parents sent her to a Job Corps program in Oregon, where Ms. Dana's feelings of helplessness resulted in an attempted suicide. This attempt was followed by a second suicide attempt at Ms. Dana's grandmother's house in Idaho, which resulted in hospitalization.

64.     While Ms. Dana survived both of these suicide attempts, the feelings of being overwhelmed and the split between Ms. Dana's life as a female and her life as a male continued into adulthood. Ms. Dana married the first woman with whom she became sexually involved, and had one child from this marriage before divorcing. Ms. Dana eventually remarried, and had five boys. While her children were supportive of Ms. Dana's living as a woman at home (wearing women's clothing and makeup), her second wife struggled over the years, and Ms. Dana's gender dysphoria placed a strain on her marriage. While Ms. Dana was able to live as a woman with her family and close friends, as an adult she continued to live as a man while at work. Ms. Dana was a welder, and it was necessary for her to present as a man at work to avoid conflict and to maintain job security.

65.     In 2017, Ms. Dana began using drugs in an attempt to deal with her untreated gender dysphoria. This eventually led to Ms. Dana's being placed on suicide watch for two days in August 2017, where she was stripped of all her clothes and thus forced to see her body unclothed, which increased both her dysphoria and suicidal thoughts. Ms. Dana spent that time in an isolation cell with a large window where she was largely naked and in plain view of the general population.

4841-3651-4492.3

66.     After being released from suicide watch in August 2017, Ms. Dana feared that the Health Care Defendants and Custodial Defendants would continue to retaliate against her for seeking to live as a transgender woman and to receive a gender dysphoria diagnosis, and felt unable to continue to seek mental health care. As a result, she returned to self-medicating with illegal drugs purchased from other inmates. In October 2017, in an attempt to get clean, Ms. Dana turned herself in to authorities and was subsequently sent to "restrictive housing" as a means to detox. During this time, she thought of suicide constantly and felt that she could not continue to exist in a man's body.

67.     Additionally, during this time Ms. Dana was also consistently harassed by both other inmates and correctional officers for her appearance, mannerisms, and sexual identification. This caused Ms. Dana to feel overwhelmed, and caused her to frequently consider suicide.

### Ms. Dana's Efforts to Obtain a Gender Dysphoria Diagnosis

68.     Since becoming incarcerated in May 2017, and until receiving a gender dysphoria diagnosis in October 2019, Ms. Dana continuously sought a diagnosis of gender dysphoria so that she could receive necessary medical treatment, including access to feminizing hormones, evaluation for and access to sex-reassignment surgery (also referred to as gender confirmation surgery), and the ability to live as a woman while incarcerated. Despite Ms. Dana's best efforts to seek the medical care she desperately needed, the MTC Defendants and Health Care Defendants repeatedly failed Ms. Dana, routinely ignoring her pleas for help and refusing to diagnose her gender dysphoria for nearly two and a half years.

69.     Moreover, the MTC Defendants, Health Care Defendants, and Custodial Defendants denied and/or ignored Ms. Dana's repeated requests to live as a woman, free from harassment. Because IDOC prison policy prohibits inmates from dressing or displaying the appearance of the opposite gender unless they have been diagnosed with gender dysphoria, the MTC Defendants' refusal to give Ms. Dana the gender dysphoria diagnosis to which they now

admit she was entitled provided cover for the Health Care Defendants and Custodial Defendants to continue to deny Ms. Dana's requests to be allowed to live as a transgender woman. At the same time, Ms. Dana's frustration with the IDOC system and appeals to the Custodial Defendants were brandished by the MTC Defendants and Health Care Defendants as "evidence" that she was somehow unfit for the gender dysphoria diagnosis.

70.     Because the MTC Defendants ignored the clinical diagnostic criteria and did not diagnose Ms. Dana with gender dysphoria, Ms. Dana suffered needlessly. The refusal to properly diagnose allowed the MTC Defendants and Health Care Defendants to refuse to consider providing Ms. Dana with feminizing hormones; refuse to consider providing Ms. Dana with sex-reassignment surgery; and deny Ms. Dana access to other medically necessary treatments for reducing her gender dysphoria, including, at times, refusing to allow her to access or wear gender-appropriate undergarments or clothing, and refusing to permit her efforts at female grooming with respect to makeup, hair styling, and hair removal.

71.     Ms. Dana repeatedly attempted to obtain an appropriate diagnosis and treatment for her gender dysphoria. She submitted numerous Corizon "Health Service Request" ("HSR") forms, IDOC "Offender Concerns" forms, and IDOC "Grievance Forms" related to medical needs resulting from her gender dysphoria. The Health Care Defendants, Custodial Defendants, and MTC Defendants repeatedly rejected her efforts.

*Ms. Dana Repeatedly Submitted HSR Forms Regarding Her Gender Dysphoria, To No Avail*

72.     True and correct copies of the HSR forms Ms. Dana submitted concerning her gender dysphoria on November 17, 2017; January 16, 2018; January 18, 2018; February 14, 2018; February 22, 2018; March 23, 2018; July 30, 2018; September 11, 2018; and October 15, 2018 are attached hereto as **Exhibit 1**.

73.     On a November 17, 2017, HSR, Ms. Dana identified as transgender and noted that she had submitted several prior HSR forms and requested hormone replacement therapy several

times. The HSR was handled by, Jack Puckett, Psychiatric Technician, who scheduled an appointment for Ms. Dana with Pat Cash.

74.     On a January 16, 2018, HSR, Ms. Dana renewed her request for hormone replacement therapy. The HSR was handled by J. Semple, RN, but does not indicate what action was taken to address Ms. Dana's concerns.

75.     On a January 18, 2018, HSR, Ms. Dana again requested that she be placed on hormone replacement therapy. There is no indication on the face of the HSR that anyone at IDOC, ISCI, or Corizon acted on Ms. Dana's request.

76.     On a February 14, 2018, HSR, Ms. Dana again asked for hormone replacement therapy and gender confirming surgery. There is no indication on the face of the HSR that anyone at IDOC, ISCI, or Corizon acted on Ms. Dana's request.

77.     On a February 22, 2018, HSR, Ms. Dana again asked for hormone replacement therapy and gender confirming health care. There is no indication on the face of the HSR that anyone at IDOC, ISCI, or Corizon acted on Ms. Dana's request.

78.     On a March 23, 2018, HSR, Ms. Dana wrote, "I am in distress about my body not matching my gender identity and I believe I need sex reassignment surgery and it would help me. Thank you." There is no indication on the face of the HSR that anyone at IDOC, ISCI, or Corizon acted on Ms. Dana's request.

79.     On a July 30, 2018, HSR, Ms. Dana wrote, "I am transgender and have been on watch since the 25th of July, and really need to shave. Was told medical might have electric razor I can use. I really need to shave hair off my face. It is causing self-hatred. Please help." There is no indication on the face of the HSR who at IDOC, ISCI, or Corizon acted on Ms. Dana's request, but the Triage note indicates "Operations Order does not allow item. No action needed. Clinician seeing already daily."

80.     On a September 11, 2018, HSR, Ms. Dana wrote, "Frustrated about my [gender dysphoria] diagnosis that you fail to do appropriately. I am obviously a girl!" The HSR was

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

handled by, Erica Clemens, LMSW, but does not indicate what action, if any, was taken to address Ms. Dana's concerns.

81.     On an October 15, 2018, HSR, Ms. Dana wrote, "Upset about being mistreated as a transgender inmate. Security staff is causing me unnecessary emotional distress and trying to strip my identity." The HSR indicates that it handled by Janet Linder, LMSW, who met with Ms. Dana that day.

82.     The foregoing HSR forms are indicative of the frequency with which Ms. Dana advocated for herself and sought a gender dysphoria diagnosis from May 2017 to October 2019; the clarity with which she expressed herself to the Health Care Defendants and the Custodial Defendants about her gender dysphoria and her corresponding urgent need for medical care; and the systematic way in which IDOC and Corizon personnel, including the Health Care Defendants and the Custodial Defendants, minimized, ignored, or refused Ms. Dana's repeated requests.

*Ms. Dana Repeatedly Submitted IDOC Grievance Forms Regarding Her Gender Dysphoria, To No Avail*

83.     True and correct copies of the IDOC Grievance Forms Ms. Dana submitted concerning her gender dysphoria on January 18, 2018; January 25, 2018; February 15, 2018; May 3, 2018; and May 8, 2018 are attached hereto as **Exhibit 2**.

84.     On January 18, 2018, Ms. Dana submitted an IDOC Grievance Form stating, "I asked why my hormone therapy has not started yet tired of getting the run around, I already started process at ISCI, I want my hormone therapy, I am a transgender and identify as a woman. I in fact have tried to follow process at ISCI, but got moved." She also indicated having tried to resolve this problem informally by "Grievance, concerns to mental health, medical, talking with several clinicians and MS Hahn at ISCI and putting in concerns here at ISCC." Defendant Clark is identified on the IDOC Grievance Form as the Level 1 Responder.

85.     Defendant Clark's response informed Ms. Dana that the MTC would be meeting to discuss her gender dysphoria assessment on February 7, 2018; explained that if Ms. Dana met

the criteria for gender dysphoria, the MTC would establish a treatment plan that may include hormone replacement therapy; and asked Ms. Dana to "Please try to be patient with the process." In fact, Defendant Clark's representation to Ms. Dana that she would receive a gender dysphoria diagnosis from the MTC if she met the clinical criteria was false. As will be discussed below, the MTC and the MTC Defendants failed to apply any clinical criteria during the February 7, 2018, meeting. Instead, they focused solely on factors irrelevant to the clinical determination of gender dysphoria, primarily questioning Ms. Dana's credibility.

86.     On January 25, 2018, Ms. Dana submitted an IDOC Grievance Form seeking permission to wear a bra, which was denied by Clinician Nicodemus because Ms. Dana did not have a gender dysphoria diagnosis. The Level 1 Responder was Defendant Pierson; the Level 2 Responder was Defendant Roberts; and the Level 3 Responder was Defendant Siegert.

87.     Ms. Dana noted in her appeal of the initial decision, "I have tried to follow protocol here at IDOC for my gender dysphoria. But there have been several clinicians who [have] transphobia and have in fact discriminated against me and lied and falsified my information trying to cause me harm in an act of aggression against me and have caused me psychological distress of a daily basis." Defendant Siegert's response on appeal: "I'm sorry that you are frustrated regarding your request for a bra. A review of your medical record shows that your case was evaluated by the Medical Treatment Committee (MTC) and the committee determined that you did not meet criteria for a Gender Dysphoria diagnosis. Since you did not meet criteria for a GD diagnosis you will not be issued a bra." In fact, Defendant Siegert's representation to Ms. Dana that the MTC determined that she did not meet the criteria for a gender dysphoria diagnosis was false. The MTC and the MTC Defendants failed to consider the clinical criteria at all on February 7, 2018. And while the MTC denied Ms. Dana a gender dysphoria diagnosis at that time, its decision was not based on clinical criteria.

88.     On February 15, 2018, Ms. Dana submitted an IDOC Grievance Form stating, "I am being denied adequate mental health services, which is cruel and unusual punishment and

23

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

gender confirming health care which I am entitled to. You are all causing me psychological distress." She also indicated having tried to resolve this problem informally by "Concerns, HSR, talking to staff and mental health; have over 30 concerns in and complaints in. Even to chief of prisons." The Level 1 Responder was Defendant Pierson and the Level 2 Responder was Defendant Roberts.

89.     Defendant Pierson wrote in his Level 1 response: "The MTC members denied you this specific diagnosis on 2-15-18. You do not meet criteria at this time." In fact, Defendant Pierson's representation to Ms. Dana that the MTC determined that she did not meet the criteria for a gender dysphoria diagnosis was false. The MTC and the MTC Defendants failed to consider the clinical criteria at all on February 7, 2018. And while the MTC denied Ms. Dana a gender dysphoria diagnosis at that time, its decision was not based on clinical criteria.

90.     Defendant Roberts wrote in his Level 2 response: "Mr. Dana, unfortunately you have been denied. I was informed that you could revisit this in a year. You can always reach out to your unit clinician for your mental health needs. Thanks." Defendant Roberts' response to Ms. Dana sought to perpetuate the IDOC myth that any of the MTC Defendants, Health Care Defendants, Grievance Form Defendants, or Custodial Defendants had any intention of dealing seriously or according to clinical diagnostic criteria with Ms. Dana's gender dysphoria.  By February 15, 2018, Ms. Dana had already spent several months communicating her physical and mental health concerns stemming from her gender dysphoria to anyone within the IDOC system who would listen, using the IDOC-approved channels available to her. She had, in fact, described her mental health needs in great detail to her unit clinician and others. Simply put, no one at IDOC took Ms. Dana seriously, nor bothered to seriously assess her according to the clinical diagnostic criteria for gender dysphoria.

91.     On May 3, 2018, Ms. Dana submitted an IDOC Grievance Form stating, "I am letting you know I am in deep distress about not having my body match my gender identity, also I am asking you please give me gender affirming surgery to match my identity. Stop ignoring my

issues." She also indicated having tried to resolve this problem informally by "concern forms, HSR, talking to staff and clinicians." The Level 1 Responder was Defendant Pierson; the Level 2 Responder was Defendant Roberts; and the Level 3 Responder was Defendant Siegert.

92.     Defendant Pierson wrote in his Level 1 response: "Dana your concerns as mentioned above were reviewed by the MTC committee as previously stated. They determined that you are not eligible for HT or GD treatment at this time."

93.     Defendant Grant wrote in his Level 2 response: "Dana this has been addressed in previous grievances. You do not meet criteria at this time for any further treatment." This representation was the same falsehood that Defendant Clark advanced in response to Ms. Dana's January 18 IDOC Grievance Form and Defendant Pierson advanced in response to her February 15 IDOC Grievance Form. The assertion that the MTC had determined that Ms. Dana did not meet the criteria for a gender dysphoria diagnosis was false. The MTC and the MTC Defendants failed to consider the clinical criteria at all on February 7, 2018. Nor was the MTC's denial of Ms. Dana's gender dysphoria diagnosis based on clinical criteria.

94.     Defendant Siegert wrote in her Level 3 response: "I would encourage you to address your concerns with the MTC and your assigned clinician. I do not have the authority to order or direct the medical providers or the MTC to provide or even consider what you are requesting." Defendant Siegert continued to perpetuate the closed-loop system in which Ms. Dana was passed from one official channel to the next within IDOC, with no one taking her physical or mental health seriously, and no one assessing her for gender dysphoria using clinical diagnostic criteria.

95.     On May 8, 2018, Ms. Dana submitted an IDOC Grievance Form stating, "Staff continues to harass me, discriminate against me, make fun of me all the way to medical staff. I am being denied my identity as a woman. I am very upset and cry almost every day because of the abuse and you all let it happen and obviously do not care. You all let it continue." She also indicated having tried to resolve this problem informally by "concern forms, talking to clinicians,

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

talking to staff, calling PREA *773, putting in HSR, etc! here at ISCC." The Level 1 Responder was Adam Miller, and the Level 2 Responder was Defendant Dietz.

96.     Mr. Miller's response instructed Ms. Dana that she could not wear makeup or use other contraband to wear as clothing or place in her hair; that she could not purchase female items at the commissary because she was not a woman; and that anything dealing with gender dysphoria needed to be addressed to Defendant Nicodemus.

97.     Defendant Dietz wrote in his Level 2 response: "I concur with Sgt. Miller's response. You are not being abused or harassed. If you continue to violate rules it will be addressed with you. This does not constitute abuse or harassment. Your PREA allegations have been investigated and found to be unsubstantiated." Defendant Dietz was a member of the MTC and knew at the time of this response that the MTC and the MTC Defendants had failed to follow clinical diagnostic criteria to assess Ms. Dana's gender dysphoria. Yet his response, and that of Mr. Miller, continued to suggest to Ms. Dana that her gender dysphoria assessment had been properly conducted, and that her only recourse with respect to her gender dysphoria was to go to Defendant Nicodemus. Significantly, neither Mr. Miller nor Defendant Dietz suggested what Defendant Nicodemus could actually do, if anything, to assist her.

98.     Collectively, the Grievance Form Defendants made the false representations to Ms. Dana described above regarding the MTC's process, including the repeated and erroneous suggestion that the MTC properly assessed her for gender dysphoria before denying her the diagnosis in February 2018. The Grievance Form Defendants, by misstating facts then unknown to Ms. Dana and suggesting that responsibility for her grievances fell to others, actively ignored Ms. Dana's repeated cries for help and relief from the mental and physical distress of her undiagnosed and untreated gender dysphoria. In doing so, they exacerbated her very real distress and feelings of hopelessness.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

*MTC Meetings Concerning Ms. Dana's Request for a Gender Dysphoria Diagnosis*

99.     Since May 2017, the MTC has considered Ms. Dana's request for a gender dysphoria diagnosis no less than five times—on February 7, 2018; April 11, 2018; October 3, 2018; November 7, 2018; and October 2, 2019. For nearly two and a half years, until it suddenly reversed course on October 2, 2019, the MTC and the MTC Defendants systematically denied a gender dysphoria diagnosis to Ms. Dana for reasons unrelated to the clinical criteria for assessing gender dysphoria—citing perceived malingering, lack of truthfulness, or personality disorders, none of which is recognized as a medically valid basis to withhold a gender dysphoria diagnosis to one who meets the clinical criteria, as Ms. Dana did and does.

100.    True and correct copies of MTC Meeting Minutes from February 7, 2018; April 11, 2018; October 3, 2018; November 7, 2018; and October 2, 2019 are attached hereto as **Exhibit 3**.

101.    On February 7, 2018, the MTC considered Ms. Dana's request for a gender dysphoria diagnosis. Defendants Campbell, Stewart, Krafft, Valley, Nicodemus, Clement, Eliason, Hahn, McKay, Watson, Kaylene Hartt, Menard, Gimmeson, and Munoz were present, as was non-party Amanda Weed. Defendant Hahn presented to the MTC. Notes from the meeting indicate:

> [Ms. Dana] is requesting PC stating inmate was chased out of unit 14. Inmate presented different each time he met with clinician Morgan and contradicted self. Ages changed from interview to interview first it was 3 then 7. Seemed coached. He states he has been talking to Carr. No dysphoria present.

The MTC Defendants' rendered the following decision: "No diagnosis of GD is made or affirmed by the committee."

102.    In addition to using male pronouns to refer to Ms. Dana, the February 7, 2018, MTC Meeting Minutes contain no evidence that the MTC Defendants used any clinical diagnostic criteria to assess Ms. Dana's gender dysphoria symptoms. The MTC Meeting Minutes indicate that the MTC Defendants instead focused solely on questioning her credibility,

4841-3651-4492.3

specifically citing "contradictions" between sessions with the Clinician and surmising that Ms.

Dana "seemed coached."

103. On April 11, 2018, the MTC again considered Ms. Dana's request for a gender

dysphoria diagnosis. Defendants Campbell, Valley, Nicodemus, McKay, Watson, and Menard

were present, as was non-party Amanda Weed. Defendant Watson presented to the MTC. Notes

from the meeting indicate:

> [Ms. Dana] is requesting PC stating inmate was chased out of unit
> 14. Inmate presented different each time the inmate met with
> clinician Morgan and contradicted self. Ages changed from
> interview to interview first it was 3 then 7. Inmate seems coached.
> Dana states Dana has been talking to another transgender, possibly
> to receive information on how to effectively present symptoms to
> evaluator. No dysphoria observed or reported.

The MTC Defendants' rendered the following decision: "No diagnosis of GD is made or

affirmed by the committee."

104. The April 11, 2018, MTC Meeting Minutes indicate that the MTC Defendants

again failed to consider diagnostic factors and apply them to Ms. Dana. Instead the MTC and the

MTC Defendants continued to focus solely on questioning her credibility, citing the same

"contradictions" between sessions with the Clinician and surmising that Ms. Dana "seemed

coached." The MTC also engaged in pure speculation, that Ms. Dana's "talking to another

transgender" was "possibly to receive information on how to effectively present symptoms to

evaluation." It apparently never occurred to the MTC Defendants that Ms. Dana could have

sought out another transgender inmate for support because her repeated requests for the medical

attention to which she was entitled as a gender dysphoria sufferer were being rejected by the

MTC. Again, there is no evidence in the MTC Meeting Minutes that the MTC Defendants used

any clinical diagnostic criteria to assess Ms. Dana's gender dysphoria symptoms in April 2018.

105. On October 3, 2018, Ms. Dana's request for a gender dysphoria diagnosis again

came before the MTC. Defendants Campbell, Menard, Clark, Watson, Nicodemus, Valley,

McKay, Stewart, and Boggs were present. Notes from the meeting indicate:

- Dr. Campbell conducted initial GD evaluation with Mr. Dana on 10/12/18. Impression was that transgender identity appears well established, but there is no indication of clinical distress.

- Rona Siegert, Health Services Director, received concern form from inmate Dana earlier this month and expressed concern that her review of records suggested that inmate Dana might be appropriate for a diagnosis of GD and associated services.

- Staff discussed GD diagnosis and no distress has been noted by clinical staff in multiple environments (ISCI and ISCC). Has a history of claiming prior identification of female identity but this is disconfirmed by PSI or other reports in file prior to incarceration.

- Clinical staff noted that Dana's history has significant issues of power and control over women, which seems to be related to Dana's request for GD diagnosis.

- Clinician Adkisson felt targeted by inmate Dana earlier when Dana was angry about a clinical decision. Clinical staff expressed concern that Dana's dishonesty and misperception in that situation seems to be an extension of the same power and control issues that need to be addressed before a GD diagnosis would be appropriate.

- Clinician Stewart (assigned clinician) reported that emotional distress is present, but personality issues complicate evaluating etiology of distress. Appears more to be related to behavioral and personality issues, and trauma (both recent and historical).

- Committee does not recommend diagnosis be made. However, Dr. Campbell will continue to consider.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

4841-3651-4492.3

- PLAN: DOR is not being written for make up in current housing unit. No other changes to management or treatment is made.

106.    At the October 3, 2018, MTC meeting, Defendant Campbell, the Chief Psychologist at ISCI, accurately identified Ms. Dana as having a "well established" transgender identity, and Defendant Siegert, the IDOC Health Services Director, suggested that a gender dysphoria diagnosis might be appropriate for Ms. Dana. But the MTC focused its discussion on "no distress" having been noticed by clinical staff; "issues of power and control," which it was claimed "need to be addressed before a GD diagnosis would be appropriate;" "dishonesty;" and "behavioral and personality issues." By focusing on these extraneous factors to deny Ms. Dana a gender dysphoria diagnosis, rather than following clinical guidelines for assessing gender dysphoria, the MTC and the MTC Defendants showed much more than a mere difference of medical opinion or treatment. They demonstrated that they either lacked the appropriate medical training and knowledge to understand and apply the clinical diagnostic criteria for gender dysphoria, or that they were willing to intentionally ignore those diagnostic criteria to arrive at their conclusion.

107.    On November 7, 2018, the MTC again considered Ms. Dana's request for a gender dysphoria diagnosis. Defendants Campbell, Clark, Watson, Nicodemus, Valley, McKay, Stewart, Boggs, Myers, Bennett, Wise, Stewart, Krafft, Emma Hartt, Le, Siegert, Gimmeson, Clement, and Mickelson were present. Notes from the meeting indicate:

- Previous assessment was a year ago—not diagnosed.
- Dr. Campbell assessment supports diagnosis of GD, while recognizing confounding factors that complicate diagnosis. Discussion is invited.
- Clinician Boggs does not support GD. Antisocial behavior needs to be addressed. Dana won't address trauma.
- Clinician Stewart sees a personality disorder rather than gender dysphoria. Unable to tell where distress is coming from.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

- Clinical Supervisor Clark is concerned that it will not change Dana's behavior problems. Recommends further assessment.

- DW McKay stated that when Dana was told no behaviors increased.

- Plan: Encourage further assessment. Dr. Campbell will meet and discuss with Dana. Next assessment in 3 months.

108.    Defendant Campbell, the Chief Psychologist at ISCI, accurately diagnosed Ms. Dana with gender dysphoria on October 30, 2018, a finding presented to the MTC at the November 7, 2018, meeting.  Defendants Clinicians Boggs and Stewart, Clinical Supervisor Clark, and Deputy Warden McKay—none of whom is known to have any training in assessing gender dysphoria, and one of whom is not even a medical professional—argued against a gender dysphoria diagnosis. The MTC and the MTC Defendants ignored the clinical diagnostic criteria for gender dysphoria; substituted the non sequitur opinions of MTC members untrained in assessing gender dysphoria for the assessment of the Chief Psychologist; and decided not to diagnose Ms. Dana with gender dysphoria. This was not a difference of medical opinion or treatment plan. It was a complete abdication by the MTC Defendants of the MTC's duty to apply the clinical diagnostic criteria for gender dysphoria to Ms. Dana's case—an abdication all the more remarkable because Dr. Campbell, one of the few MTC members even arguably qualified to properly assess gender dysphoria, allowed the opinions of clearly unqualified MTC members to override his assessment.

109.    In April 2019, Plaintiff's expert, Dr. Ettner, met with, interviewed, and conducted a battery of psychological tests upon Ms. Dana, and ultimately diagnosed her with gender dysphoria and as having severe suicidal tendencies brought about and exacerbated by this untreated condition. Dr. Ettner's report—including her conclusion that Ms. Dana has severe suicidal tendencies due to untreated gender dysphoria—was forwarded through counsel to IDOC and all defendants on May 7, 2019. A true and correct copy of Dr. Ettner's report is attached hereto as **Exhibit 4**.

31
SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

110.    Despite a note in the November 7, 2018, MTC Meeting Minutes that Ms. Dana's next assessment would occur in three months (i.e., by February 2019); despite Dr. Campbell's assessment in November 2018 that Ms. Dana met the gender dysphoria diagnostic criteria; despite the MTC's acknowledgment in November 2018 that Ms. Dana was in "distress;" despite numerous other instances in which Ms. Dana communicated via HSRs and Grievance forms to the Health Care Defendants and the Custodial Defendants her specific request for a gender dysphoria diagnosis and specific instances of distress; despite Ms. Dana's history of suicide attempts; and despite IDOC's receiving Dr. Ettner's report in May 2019, the records provided by IDOC in this case indicate that the MTC Defendants took no further action to evaluate Ms. Dana for gender dysphoria for nearly a year, until October 2019.

111.    On October 2, 2019, the MTC met for a final time to consider Ms. Dana's request for a gender dysphoria diagnosis. Defendants Campbell, Clark, Watson, Le, Stewart, and McKay were present, as was non-party Lisa Eagle. Notes from the meeting indicate:

- Presented by Chief Psychologist Campbell.

- Had previously been assessed and denied diagnosis due to inconsistent answers (contrary to documented history) and complex co-occurring disorders.

- Was re-assessed after staff brought concerns about ongoing distress. Was re-assessed previous week by Campbell.

- Diagnosis is made, affirmed by MTC. Dana is requesting cross sex hormone therapy – will be allowed to request through medical.

- Housing is appropriate – showers accommodated in current housing unit (BHU).

Although the MTC and MTC Defendants finally gave Ms. Dana the gender dysphoria diagnosis she had so long deserved, this last MTC meeting is in many respects the most damning.

112.    First, the MTC and MTC Defendants admit in their October 2, 2019, MTC
Meeting Minutes that their prior refusal to diagnose had not been based on clinical criteria at all,
but on "inconsistent answers" and "complex co-occurring disorders." The diagnostic criteria are
clear: neither of these purported rationales should factor into a gender dysphoria diagnosis, let
alone justify a denial. That they did for nearly two and a half years, while Ms. Dana suffered,
only serves to underscore that the MTC and MTC Defendants' failures went far beyond
differences of opinion or treatment. The MTC and the MTC Defendants failed to apply the
correct diagnostic standard at all. And even when they did, as was the case with Dr. Campbell's
October 30, 2018, assessment, the correct diagnosis was voted down by unqualified MTC
Defendants and acceded to by those MTC Defendants who knew, or should have known, better.

113.    Next, the MTC and MTC Defendants admit in their October 2, 2019, MTC
Meeting Minutes that Ms. Dana was only re-assessed, in late September 2019, "after staff
brought concerns about ongoing distress." Tacit in this admission are two further admissions: (1)
that the MTC and the MTC Defendants failed to re-assess Ms. Dana for nearly a year,
approximately seven months after its own Meeting Minutes indicated she should be re-evaluated;
and (2) that the MTC and the MTC Defendants delayed this reassessment for nearly a year
despite being on notice of Ms. Dana's distress: acknowledged by Dr. Campbell in his October
30, 2018, assessment; evident in Ms. Dana's HSRs and Grievances throughout 2018 and into
2019; and suffered by Ms. Dana in the form of severe suicidal tendencies, noted by Dr. Ettner
and conveyed to IDOC in May 2018.

114.    Taken together, the MTC Meeting Minutes demonstrate the MTC Defendants'
repeated failure to use the required clinical diagnostic criteria to assess Ms. Dana's gender
dysphoria. The MTC Meeting Minutes also offer at least one other reason why the MTC
Defendants persisted in denying the appropriate gender dysphoria diagnosis to Ms. Dana for
nearly two and a half years. The MTC Defendants clearly *perceived* Ms. Dana as potentially
having other mental health issues, and repeatedly suggested that it would be improper to treat her

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

for gender dysphoria unless and until those other, perceived mental health issues were addressed. In other words, the MTC Defendants consistently behaved toward Ms. Dana as though individuals with, e.g., *perceived* personality disorders or aggression toward other women—even if the MTC Defendants' perceptions were untrue or incorrect—were ineligible to receive a gender dysphoria diagnosis. The gender dysphoria clinical diagnostic criteria and guidelines flatly contradict this. Yet not once does the record reflect any of the MTC Defendants pushing back when this medically incorrect, subjective, and patently discriminatory pseudo-scientific belief was introduced during their deliberations of Ms. Dana's case. Nor does the record reflect any of the MTC Defendants even considering that what they perceived to be Ms. Dana's mental health issues were, in fact, manifestations of her untreated gender dysphoria.

*Ms. Dana Has Been the Victim of Sexual Assault Due to the Custodial Defendants' Inaction and Failure to Protect Her*

115.    The Custodial Defendants have also failed to adequately protect Plaintiff from harm, including risk of sexual assault. Ms. Dana originally became concerned about a fellow inmate at ISCC, Robert A. Geib, in mid to late May 2018, when he continuously pursued her and attempted to force her to perform sexual acts on him. In one such instance, inmate Geib had another inmate trick Ms. Dana into entering a cell, locked the door behind her, and then forced her to touch his genitalia.

116.    Shortly after that assault, Ms. Dana reported her concerns about inmate Geib to C/O Walton and Lieutenant Purcell, and requested to be moved from Tier G-2. In late May 2018, Ms. Dana was relocated to Tier G-3. However, only a few weeks later in June 2018, inmate Geib was also inexplicably relocated to Tier G-3, where he once again had access to Ms. Dana.

117.    Inmate Geib began harassing Ms. Dana almost as soon as he was moved, and would follow her to the showers where he would try to watch her shower while making sexual threats to her. Finally, on or about June 27, 2018, inmate Geib entered Ms. Dana's cell and sexually assaulted her.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

118.     This assault was in addition to a generally hostile environment, in which Ms.
Dana was sexually harassed and assaulted by both inmates and officers. In response to the assault
by inmate Geib, Ms. Dana called the PREA hotline in early July 2018 to report the offending
inmate. However, once Defendants Smyth, Walton, and other IDOC correctional officers became
aware that Ms. Dana had been using the PREA hotline, they told her that she could no longer use
it, as it was creating additional "unnecessary" work for them. Defendants Smyth, Walton, and
other IDOC correctional officers also informed Ms. Dana that if she did not stop calling PREA,
they would throw her in "the hole" (solitary confinement) "for her own protection." Defendants
Smyth, Walton, and other IDOC correctional officers also threatened to confiscate Ms. Dana's
feminine items if she continued to call the PREA hotline.

119.     In addition to the sexual assault in June 2018, Ms. Dana suffered another sexual
assault by an inmate and multiple instances of sexual harassment by inmates and prison officials.
Among other things, Defendant Walton forced Ms. Dana to stand up off the toilet and expose
herself to him. Defendant Walton threatened to give her a Class-A write-up and put her in the
hole if she did not comply. These continued abuses, in conjunction with Ms. Dana's inability to
present as a woman and receive medically necessary feminizing hormones, have significantly
affected Ms. Dana's mental health.

120.     As a result of Defendants' failure to adequately diagnose and treat Ms. Dana's
gender dysphoria, she attempted suicide for a third time in her prison cell in or around June
2018—not coincidentally, after filing the series of futile HSR and IDOC Grievance Forms
described above. Though ultimately unsuccessful, this most recent attempt was a result of Ms.
Dana's living in a near constant state of feeling overwhelmed and wanting to end her life.

121.     Ms. Dana's suicidal feelings were so pervasive that at times she resorted to
carrying a razor blade in her underwear so that she had the option of either killing herself, or in
the alternative, attempting self-surgery. While Ms. Dana has not performed self-surgery, on
several occasions prior to receiving her gender dysphoria diagnosis in October 2019 she initiated

35

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

the attempt, and was only stopped by the thought of ruining her chances of a successful gender reassignment surgery.

*Ms. Dana Has Been Repeatedly Harassed, Disciplined, Punished, Retaliated Against, and Targeted by IDOC Correctional Officers and the Custodial Defendants for Expressing Her Gender Identity*

122.    Despite having received her gender dysphoria diagnosis in October 2019, and responding well to the hormone replacement therapy, counseling sessions, and other support services afforded to transgender inmates suffering from gender dysphoria, the pattern of harassment, retaliation, and targeting that Ms. Dana suffered at the hands of IDOC correctional officers and the Custodial Defendants before receiving her diagnosis continues.

123.    Ms. Dana is informed and believes that IDOC correctional officers and the Custodial Defendants have singled her out for harassment, retaliation, and targeting for several reasons, including: she presents as a transgender woman; she has consistently advocated for a gender dysphoria diagnosis and to be treated as a transgender woman; and her suit, originally filed in Federal District Court in July 2018, named several of them as defendants.

124.    On or about October 23, 2017, Defendant Evancho cuffed Plaintiff's arms behind her back when escorting her from her cell, and then very forcefully shoved her down a walkway. Ms. Dana is informed and believes that Defendant Evancho acted deliberately to harm and intimidate her for presenting and seeking to live as a transgender woman. Although Ms. Dana grieved this incident through the proper IDOC channels, no action was taken aside from a cursory internal review of video footage. To Ms. Dana's knowledge, no subsequent investigation of Defendant Evancho's actions was ever performed by IDOC.

125.    On May 28, 2019, counsel for Ms. Dana gave notice to counsel for IDOC in this matter about an incident that occurred on the morning of May 27, 2019, between Ms. Dana and IDOC personnel. The incident began as a minor argument regarding the provision of kosher meals to Mr. Hoffman (Ms. Dana's then-boyfriend) and an FSO at breakfast. It resulted in Ms.

Dana's: being handcuffed and put in the cage; having repeated requests to use a restroom or receive a vessel to urinate into refused, despite her explaining that her medical situation makes it quite difficult to maintain continence; urinating in her clothes, shoes, and the bottom of the cage as a result of those refusals; using her ID card to try and push the urine out from underneath her; receiving a Class A write-up for purportedly flinging urine and feces at guards (which Ms. Dana expects the prison's own video footage to plainly contradict); and having all of her feminine clothes and products confiscated—save for the bra she was wearing, thanks to the intervention of Defendant Myers.

126.    Counsel for Ms. Dana requested on May 28, 2019: (1) that the duration of Ms. Dana's solitary confinement be communicated to her and to them; (2) that her feminine clothes and products be returned to her as soon as possible; and (3) that a supervisory review of the incident be conducted (e.g., through viewing of available video footage) to identify the IDOC personnel involved, investigate the behavior of those IDOC personnel, and determine the appropriateness of their treatment of Ms. Dana. Ms. Dana was kept in solitary confinement for over a week. To date, no investigation has been performed by IDOC. Ms. Dana will amend her complaint to allege the specific identities of the correctional officers responsible when IDOC provides the results of its review and investigation.

127.    Even after receiving her gender dysphoria diagnosis, Ms. Dana has been harassed consistently for several months by Defendant Taylor because of her status as a transgender woman. While much of this harassment has been on the order of teasing, name-calling, and minor power plays (breaking the power cord on Ms. Dana's television, for example), the danger to Ms. Dana increased significantly on or about May 20, 2020. On that day, Defendant Taylor refused to turn the lights on in the showers, creating a health and safety hazard for Ms. Dana by forcing her to shower in the dark. While Defendant Taylor ultimately relented, his bullying and retaliatory behavior has been an all too common reality for Ms. Dana—first because she sought a gender dysphoria diagnosis and now because she seeks to enjoy it. Ms. Dana submitted a

4841-3651-4492.3

concern form regarding the incident with Defendant Taylor, but has not been able to forward a copy to counsel.

128.     Throughout Ms. Dana's incarceration, the Custodial Defendants also repeatedly disciplined and punished her for expressing her gender identity in a manner that posed no legitimate threat to the safety and security of the prison and that were related to gender dysphoria—and that would have been acceptable under IDOC policies had she been given the gender dysphoria diagnosis she deserved. Instead, the Custodial Defendants' conduct served only to harass Ms. Dana and drive her deeper into despair. For example, the Custodial Defendants issued numerous "Disciplinary Offense Reports" to Ms. Dana, including the following:

- On May 5, 2018, Ms. Dana was reprimanded for wearing makeup because she did not have a gender dysphoria diagnosis.

- On May 13, 2018, Ms. Dana was reprimanded for wearing makeup because she did not have a gender dysphoria diagnosis.

- On May 28, 2018, Ms. Dana was disciplined by C/O Walton for using pen ink as eye-liner, because she did not have a gender dysphoria diagnosis.

- On August 26, 2018, Ms. Dana was forced to remove her makeup by C/O Covarrubias, because she did not have a gender dysphoria diagnosis.

- On October 18, 2018, Ms. Dana was given a warning by C/O Gresick for wearing makeup, because she did not have a gender dysphoria diagnosis.

- On October 21, 2018, Ms. Dana was disciplined by C/O Covarrubias for using pen ink as eye-liner, because she did not have a gender dysphoria diagnosis.

129.     IDOC Custodial Defendants appeared to have deliberately targeted Ms. Dana and retaliated against her in ways designed to antagonize her, exacerbate her gender dysphoria, and cause her severe pain and humiliation. Moreover, keeping her in solitary confinement in May and June 2019 jeopardized her health and wellbeing. The Custodial Defendants had Dr. Ettner's report in hand at the time of this incident, and knew or should have known the devastating

4841-3651-4492.3

psychological consequences that could follow not only from the solitary confinement but from IDOC's prohibiting Ms. Dana from expressing her true gender identity, as it did here by confiscating her feminine clothes and products.

130.    The MTC Defendants, Health Care Defendants, Grievance Form Defendants, and Custodial Defendants were all on notice from no later than November 2017 that Ms. Dana consistently sought treatment for her gender dysphoria; that Ms. Dana sought to be treated as a transgender woman and sought treatment for her gender dysphoria through proper IDOC channels, including submitting numerous HSR forms and numerous IDOC Grievance Forms; that Ms. Dana made multiple suicide attempts due to her undiagnosed gender dysphoria; that Ms. Dana was brutally assaulted by an inmate due to her identity as a transgender woman; that Ms. Dana attempted to access the PREA hotline; and that IDOC correctional officers have continued to abuse their power and retaliate against Ms. Dana during the pendency of her lawsuit, including in May 2019 and May 2020.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Failure to Provide Necessary Medical Treatment (8th Amendment; 42 U.S.C. § 1983)**

*Against MTC Defendants, Health Care Defendants, and Grievance Form Defendants*

131.    Ms. Dana repeats and re-alleges the allegations in paragraphs 1-130 as if fully set forth herein.

132.    Ms. Dana suffers from the serious medical condition of gender dysphoria, which continued to cause Ms. Dana serious mental distress and, without necessary treatment, resulted in serious physical harm to Ms. Dana from May 2017 through October 2019.

133.    In October 2019, after nearly two and a half years of improperly denying her the diagnosis—based on failure to assess Ms. Dana according to clinical diagnostic criteria, the MTC Defendants abruptly changed course and granted her the appropriate diagnosis, to which she had been entitled all along.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

134.     The MTC Defendants and Health Care Defendants are responsible for providing
adequate and necessary diagnosis and medical treatment to Ms. Dana, including treatment for
persons diagnosed with gender dysphoria.

135.     The MTC Defendants and Health Care Defendants failed not only to provide
adequate and necessary treatment to Ms. Dana consistent with prevailing medical standards of
care for gender dysphoria, but failed to assess her according to the clinical diagnostic criteria for
gender dysphoria at all. Instead, the MTC Defendants and Health Care Defendants concocted
non-empirical rationales completely divorced from the diagnostic criteria to deny Ms. Dana the
proper clinical diagnosis in February, May, October, and November 2018. The MTC Meeting
Minutes themselves tell the story of this complete breakdown to the required scientific process of
diagnosing gender dysphoria. Perhaps most egregiously, the MTC Defendants denied Ms. Dana
the appropriate diagnosis in November 2018 despite an assessment from Dr. Campbell indicating
that she suffered from gender dysphoria. Yet Dr. Campbell allowed non-medical personnel and
clearly unqualified medical personnel on the MTC to substitute their judgment for his. Worse,
Ms. Dana was not re-evaluated again for nearly a year, despite promises from the MTC itself to
re-evaluate her in February 2019 and IDOC's receipt of a report from Dr. Ettner in May 2019
confirming that Ms. Dana suffered from gender dysphoria. Due to these failures by the MTC
Defendants and Health Care Defendants, Ms. Dana suffered unnecessary mental and physical
maladies due to her untreated gender dysphoria.

136.     The Grievance Form Defendants compounded the failure of the MTC Defendants
and Health Care Defendants by misrepresenting to Ms. Dana the true nature of the MTC
deliberations and decision concerning her request for a gender dysphoria diagnosis, specifically
by stating in February and May 2018 that Ms. Dana did not satisfy the diagnostic criteria—when,
in fact, the MTC Defendants did not evaluate Ms. Dana according to diagnostic criteria in the
first instance during that time period. By doing so, the Grievance Form Defendants sheltered the
MTC deliberations from scrutiny and caused Ms. Dana to despair that her requests for a gender

dysphoria diagnosis would ever be taken seriously by anyone at IDOC, including the MTC Defendants and Health Care Defendants.

137.    The MTC Defendants and Health Care Defendants' acts and/or omissions with respect to Ms. Dana's gender dysphoria diagnosis reflect either a policy, custom, practice and/or procedure of failing to provide proper and necessary medical diagnoses and treatments to inmates suffering from gender dysphoria; an inability to properly diagnose inmates suffering from gender dysphoria due to lack of skill or training; or a refusal, in the case of Ms. Dana, to properly diagnose inmates suffering from gender dysphoria by, among other things, relying on non-clinical diagnostic criteria or the opinions of individuals unqualified to assess gender dysphoria.

138.    From May 2017 to October 2019, each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants was deliberately indifferent to Ms. Dana's medical need to be adequately diagnosed and treated for gender dysphoria, including but not limited to: refusing to or being incapable of rendering a diagnosis of gender dysphoria; refusing to acknowledge the gender dysphoria diagnosis of Plaintiff's expert, Dr. Randi Ettner; and refusing to provide hormone treatment therapy, as well as other medical treatments and accommodations that would have alleviated Ms. Dana's serious medical symptoms. Each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants knew of Ms. Dana's serious medical need for treatment for gender dysphoria and failed to take reasonable measures to address her continued pain and suffering resulting from her undiagnosed and untreated gender dysphoria through October 2019.

139.    Each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants' denial of necessary medical treatment for gender dysphoria from May 2017 to October 2019 caused irreparable harm and unnecessary suffering to Ms. Dana, including severe anxiety and distress resulting in emotional, psychological, and physical harm.

140.     Each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants' failure to provide necessary medical treatment to Ms. Dana violated the Eighth Amendment to the U.S. Constitution.

141.     As a direct and legal result of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants' actions and omissions, Ms. Dana has suffered and continues to suffer damages including, without limitation: pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

142.     Each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants engaged in the aforementioned acts or omissions and/or ratified such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Dana, thereby justifying an award of compensative damages in an amount to be determined at trial. An award of punitive and exemplary damages in an amount to be determined at trial, is also justified against each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants except for Defendants Valley, Christensen, Dietz, and McKay.

## SECOND CLAIM FOR RELIEF

### Excessive Force (8th Amendment; 42 U.S.C. § 1983)

*Against C/O Evancho, C/O Taylor, and Custodial Does*

143.     Plaintiff repeats and re-alleges the allegations in paragraphs 1-130 as if fully set forth herein.

144.     Ms. Dana is informed and believes that IDOC correctional officers and the Custodial Defendants have singled her out for harassment, retaliation, and targeting for several reasons, including: she presents as a transgender woman; she has consistently advocated for a gender dysphoria diagnosis and to be treated as a transgender woman; and her suit, originally filed in Federal District Court in July 2018, named several of them as defendants.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

4841-3651-4492.3

145.    On or about October 23, 2017, Defendant Evancho cuffed Plaintiff's arms behind her back when escorting her from her cell, and then very forcefully shoved her down a walkway. Ms. Dana is informed and believes that Defendant Evancho acted deliberately to harm and intimidate her for presenting and seeking to live as a transgender woman. Although Ms. Dana grieved this incident through the proper IDOC channels, no action was taken aside from a cursory internal review of video footage. To Ms. Dana's knowledge, no subsequent investigation of Defendant Evancho's actions was ever performed by IDOC.

146.    Defendant Evancho acted against Ms. Dana in October 2017with malicious and sadistic force.

147.    On the morning of May 27, 2019, Ms. Dana was involved in an incident that began as a minor argument regarding the provision of kosher meals to Mr. Hoffman (Ms. Dana's then-boyfriend) and an FSO at breakfast. It resulted in Ms. Dana's: being handcuffed and put in the cage; having repeated requests to use a restroom or receive a vessel to urinate into refused, despite her explaining that her medical situation makes it quite difficult to maintain continence; urinating in her clothes, shoes, and the bottom of the cage as a result of those refusals; using her ID card to try and push the urine out from underneath her; receiving a Class A write-up for purportedly flinging urine and feces at guards (which Ms. Dana expects the prison's own video footage to plainly contradict); and having all of her feminine clothes and products confiscated— save for the bra she was wearing, thanks to the intervention of Defendant Myers.

148.    Counsel for Ms. Dana requested on May 28, 2019: (1) that the duration of Ms. Dana's solitary confinement be communicated to her and to them; (2) that her feminine clothes and products be returned to her as soon as possible; and (3) that a supervisory review of the incident be conducted (e.g., through viewing of available video footage) to identify the IDOC personnel involved, investigate the behavior of those IDOC personnel, and determine the appropriateness of their treatment of Ms. Dana. Ms. Dana was kept in solitary confinement for over a week. To date, no investigation has been performed by IDOC. Ms. Dana will amend her

complaint to allege the specific identities of the correctional officers responsible when IDOC provides the results of its review and investigation.

149.     By keeping Ms. Dana in apparently indefinite solitary confinement in May and June 2019, the Custodial Does jeopardized her health and wellbeing. The Custodial Defendants had Dr. Ettner's report in hand at the time of this incident, and knew or should have known the devastating psychological consequences that could follow not only from the solitary confinement but from prohibiting Ms. Dana from expressing her true gender identity, as the Custodial Does did by simultaneously confiscating her feminine clothes and products.

150.     The as-yet-unidentified Custodial Does acted against Ms. Dana in May and June 2019 with malicious and sadistic force.

151.     On or about May 20, 2020, Defendant Taylor refused to turn the lights on in the showers, creating a health and safety hazard for Ms. Dana by forcing her to shower in the dark. While Defendant Taylor ultimately relented, his bullying, retaliatory behavior has been an all too common reality for Ms. Dana, first because she sought a gender dysphoria diagnosis and now because she seeks to enjoy it. In this instance, Defendant Taylor's actions placed Ms. Dana in serious danger, and caused her to fear for her safety.

152.     Defendant Taylor acted against Ms. Dana in May 2020 with malicious and sadistic intent.

153.     In each of these instances, Defendants Evancho, Taylor, and Custodial Does appear to have deliberately targeted Ms. Dana and retaliated against her in ways designed to antagonized her, exacerbated her gender dysphoria, and caused her severe pain and humiliation.

154.     As a direct and legal result of Defendant's actions and omissions, Plaintiff has suffered and continues to suffer damages including, without limitation: pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

4841-3651-4492.3

155.    Defendants Evancho, Taylor, and Custodial Does engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Dana, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

### Failure to Protect (8th Amendment; 42 U.S.C. § 1983)

*Against ALL Defendants Except IDOC*

156.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-130 as if fully set forth herein.

157.    The MTC Defendants, Health Care Defendants, Grievance Form Defendants, and Custodial Defendants were all on notice from no later than November 2017 that Ms. Dana consistently sought treatment for her gender dysphoria; that Ms. Dana sought to be treated as a transgender woman and sought treatment for her gender dysphoria through proper IDOC channels, including submitting numerous HSR forms and numerous IDOC Grievance Forms; that Ms. Dana made multiple suicide attempts due to her undiagnosed gender dysphoria; that Ms. Dana was brutally assaulted by an inmate due to her identity as a transgender woman; that Ms. Dana attempted to access the PREA hotline; and that IDOC correctional officers have continued to abuse their power and retaliate against Ms. Dana during the pendency of her lawsuit, including in May 2019 and May 2020.

*Withholding of Medical Treatment*

158.    The MTC Defendants and Health Care Defendants failed to protect Ms. Dana from harm by failing or refusing to use clinical diagnostic criteria to assess her gender dysphoria, resulting in the deliberate withholding of that diagnosis and the deliberate withholding of necessary medical treatment to Ms. Dana for nearly two and a half years, resulting in pain and suffering to Ms. Dana.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]
4841-3651-4492.3

159.    The MTC Defendants and Health Care Defendants failed not only to provide adequate and necessary treatment to Ms. Dana consistent with prevailing medical standards of care for gender dysphoria, but failed to assess her according to the clinical diagnostic criteria for gender dysphoria at all. Instead, the MTC Defendants and Health Care Defendants concocted non-empirical rationales completely divorced from the diagnostic criteria to deny Ms. Dana the proper clinical diagnosis in February, May, October, and November 2018. The MTC Meeting Minutes themselves tell the story of this complete breakdown to the required scientific process of diagnosing gender dysphoria. Perhaps most egregiously, the MTC Defendants denied Ms. Dana the appropriate diagnosis in November 2018 despite an assessment from Dr. Campbell indicating that she suffered from gender dysphoria. Yet Dr. Campbell allowed non-medical personnel and clearly unqualified medical personnel on the MTC to substitute their judgment for his. Worse, Ms. Dana was not re-evaluated again for nearly a year, despite promises from the MTC itself to re-evaluate her in February 2019 and IDOC's receipt of a report from Dr. Ettner in May 2019 confirming that Ms. Dana suffered from gender dysphoria. Due to these failures by the MTC Defendants and Health Care Defendants, Ms. Dana suffered unnecessary mental and physical maladies due to her untreated gender dysphoria.

160.    The Grievance Form Defendants compounded the failure of the MTC Defendants and Health Care Defendants by misrepresenting to Ms. Dana the true nature of the MTC deliberations and decision concerning her request for a gender dysphoria diagnosis, specifically by stating in February and May 2018 that Ms. Dana did not satisfy the diagnostic criteria—when, in fact, the MTC Defendants did not evaluate Ms. Dana according to diagnostic criteria in the first instance during that time period. By doing so, the Grievance Form Defendants sheltered the MTC deliberations from scrutiny and caused Ms. Dana to despair that her requests for a gender dysphoria diagnosis would ever be taken seriously by anyone at IDOC, including the MTC Defendants and Health Care Defendants.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

161.     The MTC Defendants and Health Care Defendants' acts and/or omissions with respect to Ms. Dana's gender dysphoria diagnosis reflect either a policy, custom, practice and/or procedure of failing to provide proper and necessary medical diagnoses and treatments to inmates suffering from gender dysphoria; an inability to properly diagnose inmates suffering from gender dysphoria due to lack of skill or training; or a refusal, in the case of Ms. Dana, to properly diagnose inmates suffering from gender dysphoria by, among other things, relying on non-clinical diagnostic criteria or the opinions of individuals unqualified to assess gender dysphoria.

162.     From May 2017 to October 2019, each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants was deliberately indifferent to Ms. Dana's medical need to be adequately diagnosed and treated for gender dysphoria, including but not limited to: refusing to or being incapable of rendering a diagnosis of gender dysphoria; refusing to acknowledge the gender dysphoria diagnosis of Plaintiff's expert, Dr. Randi Ettner; and refusing to provide hormone treatment therapy, as well as other medical treatments and accommodations that would have alleviated Ms. Dana's serious medical symptoms. Each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants knew of Ms. Dana's serious medical need for treatment for gender dysphoria and failed to take reasonable measures to address her continued pain and suffering resulting from her undiagnosed and untreated gender dysphoria through October 2019.

163.     Each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants' denial of necessary medical treatment for gender dysphoria from May 2017 to October 2019 caused irreparable harm and unnecessary suffering to Ms. Dana, including severe anxiety and distress resulting in emotional, psychological, and physical harm.

164.     Each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants could have taken action to reduce the risk of harm to Ms. Dana caused by their

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

refusal or inability to render a diagnosis of gender dysphoria to Ms. Dana and provide her with necessary medical treatment for gender dysphoria, but refused or failed to do so.

165.     Each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants' failures to protect Ms. Dana, as described above, violated the Eighth Amendment to the U.S. Constitution.

166.     As a direct and legal result of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants' actions and omissions, Ms. Dana has suffered and continues to suffer damages including, without limitation: pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

167.     The MTC Defendants, Health Care Defendants, and Grievance Form Defendants engaged in the aforementioned acts or omissions and/or ratified such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Dana, thereby justifying an award of compensatory damages in an amount to be determined at trial. An award of punitive and exemplary damages in an amount to be determined at trial, is also justified against each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants except for Defendants Valley, Christensen, Dietz, and McKay.

### *Sexual Assault*

168.     The Custodial Defendants failed to protect Ms. Dana from harm by housing her in a manner which allowed another prisoner to sexually assault her in her own cell.

169.     Ms. Dana originally became concerned about a fellow inmate at ISCC, Robert A. Geib, in mid to late May 2018, when he continuously pursued her and attempted to force her to perform sexual acts on him. In one such instance, inmate Geib had another inmate trick Ms. Dana into entering a cell, locked the door behind her, and then forced her to touch his genitalia.

170.     Shortly after that assault, Ms. Dana reported her concerns about inmate Geib to Defendant Walton and Lieutenant Purcell, and requested to be moved from Tier G-2. In late May

2018, Ms. Dana was relocated to Tier G-3. However, only a few weeks later in June 2018, inmate Geib was also inexplicably relocated to Tier G-3, where he once again had access to Ms. Dana. In short, Defendant Walton and Lieutenant Purcell failed to act to protect Ms. Dana.

171.    Inmate Geib began harassing Ms. Dana almost as soon as he was moved, and would follow her to the showers where he would try to watch her shower while making sexual threats to her. Finally, on or about June 27, 2018, inmate Geib entered Ms. Dana's cell and sexually assaulted her.

172.    Ms. Dana is informed and believes that each of the Custodial Defendants had actual or constructive knowledge of the decision to house a known, violent, sexual predator— who had already assaulted Ms. Dana once—on the same tier (Tier G-3) as Ms. Dana, and that none of them took any action to protect her from inmate Geib's predations.

173.    Ms. Dana is informed and believes that each of Defendants Tewalt, Derrick, Ramirez, Valley, Christensen, Dietz, and McKay had the authority to make decisions regarding the housing of inmates, and thus at least tacitly, if not affirmatively, approved inmate Geib's transfer to Tier G-3 in June 2018, despite Ms. Dana's also being housed there at that time.

174.    The Custodial Defendants could have taken action to reduce the risk of harm to Ms. Dana, but refused or failed to do so.

175.    Each of the Custodial Defendants failed to protect Plaintiff in violation of her rights under the Eighth Amendment to the U.S. Constitution.

176.    As a direct and legal result of the Custodial Defendants' actions and omissions, Ms. Dana has suffered and continues to suffer damages including, without limitation: pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

177.    The Custodial Defendants engaged in the aforementioned acts or omissions and/or ratified such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of

Plaintiff, thereby justifying an award of compensative damages in an amount to be determined at trial. An award of punitive and exemplary damages in an amount to be determined at trial, is also justified against each of the Custodial Defendants except for Defendants Tewalt, Derrick, Ramirez, Valley, Christensen, Dietz, and McKay.

### *PREA Hotline*

178.    The Custodial Defendants also failed to follow the requirements of the PREA with respect to Ms. Dana.

179.    The assault by inmate Geib was in addition to a generally hostile environment, in which Ms. Dana was sexually harassed and assaulted by both inmates and correctional officers. In response to the assaults by inmate Geib in May 2018 and June 2018, Ms. Dana called the PREA hotline multiple time in the spring and summer of 2018 to report the offending inmate. However, instead of receiving assistance, once Defendants Smyth, Walton, and other of the Custodial Defendants became aware that Ms. Dana had been using the PREA hotline, they told her that she could no longer use it, as it was creating additional "unnecessary" work for them. Defendants Smyth, Walton, and other IDOC correctional officers also informed Ms. Dana that if she did not stop calling PREA, they would throw her in "the hole" (solitary confinement) "for her own protection." Defendants Smyth, Walton, and other IDOC correctional officers threatened Ms. Dana, and informed her that if she continued to call PREA they would confiscate her feminine items, in violation of the PREA statute.

180.    Defendant Dietz's written response to Ms. Dana's IDOC Grievance Form of May 8, 2018—"I concur with Sgt. Miller's response. You are not being abused or harassed. If you continue to violate rules it will be addressed with you. This does not constitute abuse or harassment. Your PREA allegations have been investigated and found to be unsubstantiated."— pertained to an earlier instance of Ms. Dana's use of the PREA hotline, and did not explicitly threaten her. Nevertheless, Defendant Dietz's victim-blaming had a chilling effect on Ms. Dana, and also violated the PREA statute.

4841-3651-4492.3

181.     The purposes of the PREA include: to establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States; to increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape; and to protect the Eighth Amendment rights of Federal, State, and local prisoners. 34 U.S.C. § 30302(1), (6), (7).

182.     The Custodial Defendants' responses to Ms. Dana's use of the PREA hotline included: Defendants Smyth and Walton's intimidating her from attempting to report a sexual assault without repercussions; and Defendant Dietz's attempting to chill Ms. Dana's right to access the PREA hotline by responding to her, in writing, that her claims had been investigated and determined to be unsubstantiated. Moreover, none of the Custodial Defendants' took any affirmative steps to protect Ms. Dana's statutory or free speech rights. Each of these acts violated the statutory purposes of the PREA and had a chilling effect of Ms. Dana.

183.     By threatening Ms. Dana with retaliation if she continued to make use of the PREA hotline to report sexual assaults, the Custodial Defendants also violated a number of Federal Regulations, including: 28 CFR § 115.53 (Inmate access to outside confidential support services); 28 CFR § 115.61 (Staff and agency reporting duties); and 28 CFR § 115.67 (Agency protection against retaliation).

184.     Following the threats by Defendants Smyth, Walton, Dietz, and other Custodial Defendants, and the failure of any of the Custodial Defendants to affirmatively act to protect Ms. Dana's statutory and free speech rights, Ms. Dana ceased using the PREA hotline, and did not report any other instances of sexual assault or harassment, though they continued to occur.

185.     The Custodial Defendants could have taken action to reduce the risk of harm to Ms. Dana with respect to her use of the PREA hotline, but refused or failed to do so.

186.     Each Custodial Defendant failed to protect Ms. Dana with respect to her use of the PREA hotline in violation of her rights under the Eighth Amendment to the U.S. Constitution.

187.     As a direct and legal result of Defendants' actions and omissions, Plaintiff has suffered and continues to suffer damages including, without limitation: pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

188.     The Custodial Defendants engaged in the aforementioned acts or omissions and/or ratified such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Dana, thereby justifying an award of compensatory damages in an amount to be determined at trial. An award of punitive and exemplary damages in an amount to be determined at trial, is also justified against each of the Custodial Defendants except for Defendants Tewalt, Derrick, Ramirez, Valley, Christensen, Dietz, and McKay.

### FOURTH CLAIM FOR RELIEF

### Violation of Equal Protection – Discrimination Based on Sex

### (14th Amendment; 42 U.S.C. § 1983)

*Against ALL Defendants Except IDOC*

189.     Plaintiff repeats and re-alleges the allegations in paragraphs 1-130 as if fully set forth herein.

190.     Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

191.     The MTC Defendants, Health Care Defendants, and Grievance Defendants have discriminated against Ms. Dana based on her sex by failing or refusing to follow clinical diagnostic criteria to assess her gender dysphoria, resulting in the denial of adequate and necessary medical diagnosis and treatment of her condition for nearly two and a half years.

192.     In particular, the MTC Defendants, Health Care Defendants, and Grievance Defendants have failed or refused to follow clinical diagnostic criteria to assess her gender dysphoria, resulting in the denial of adequate and necessary medical diagnosis and treatment of

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

her condition for nearly two and a half years, because she is transgender, because she is attempting to transition genders, and/or because of their own sex-based stereotyping that people who are assigned the male sex at birth should not receive medically necessary care that feminizes their bodies.

193.    The Custodial Defendants have discriminated against Ms. Dana based on her sex by disciplining her based on their own sex-based stereotyping about the ways in which Ms. Dana should appear, act, or express herself based on her sex assigned at birth.

194.    The Custodial Defendants denied various requests and/or permitted the denial of requests by Ms. Dana for commissary products allowed to similarly situated female inmates (i.e. transgender women suffering from gender dysphoria), including but not limited to women's underwear and cosmetics. The Custodial Defendants also disciplined Ms. Dana for wearing her hair in hairstyles deemed to be "feminine" that are allowed for similarly situated female inmates.

195.    The Custodial Defendants also disciplined and/or permitted the discipline of Ms. Dana for sex-based behaviors because she is transgender, because she is attempting to transition genders, and/or because of the sex-based stereotype that people who are assigned the male sex at birth should display only stereotypically male characteristics, behaviors, or dress. The Custodial Defendants thus treated Ms. Dana differently based on her sex and her perceived non-conformity with sex stereotypes, including the expectation that a person's gender must conform to the sex assigned at birth.

196.    The Custodial Defendants' treatment of Ms. Dana is based on her sex assigned at birth and sex-based stereotypes that Ms. Dana should express herself in a manner that does not include the wearing of cosmetics, "feminine" hairstyles, women's underwear, and other "feminine" behaviors and/or expressions.

197.    Throughout Ms. Dana's incarceration, the Custodial Defendants also repeatedly disciplined and punished her for expressing her gender identity in a manner that posed no legitimate threat to the safety and security of the prison and that were related to gender

4841-3651-4492.3

dysphoria—and that would have been acceptable under IDOC policies had she been given the gender dysphoria diagnosis she deserved. Instead, the Custodial Defendants' conduct served only to harass Ms. Dana and drive her deeper into despair. For example, the Custodial Defendants issued numerous "Disciplinary Offense Reports" to Ms. Dana, including the following:

- On May 5, 2018, Ms. Dana was reprimanded for wearing makeup because she did not have a gender dysphoria diagnosis.

- On May 13, 2018, Ms. Dana was reprimanded for wearing makeup because she did not have a gender dysphoria diagnosis.

- On May 28, 2018, Ms. Dana was disciplined by C/O Walton for using pen ink as eye-liner, because she did not have a gender dysphoria diagnosis.

- On August 26, 2018, Ms. Dana was forced to remove her makeup by C/O Covarrubias, because she did not have a gender dysphoria diagnosis.

- On October 18, 2018, Ms. Dana was given a warning by C/O Gresick for wearing makeup, because she did not have a gender dysphoria diagnosis.

- On October 21, 2018, Ms. Dana was disciplined by C/O Covarrubias for using pen ink as eye-liner, because she did not have a gender dysphoria diagnosis.

198.    The MTC Defendants, Health Care Defendants, Grievance Defendants, and Custodial Defendants discriminated against Ms. Dana because of sex, sex stereotyping, and/or gender identity pursuant to official policies, procedures, customs, and/or practices.

199.    The MTC Defendants, Health Care Defendants, Grievance Defendants, and Custodial Defendants' discriminatory treatment of Ms. Dana because of sex, sex stereotyping, and/or gender identity deprives Ms. Dana of her right to equal protection of the laws guaranteed by the Fourteenth Amendment to the U.S. Constitution.

200.    The MTC Defendants, Health Care Defendants, Grievance Defendants, and Custodial Defendants' discrimination against Ms. Dana because of sex, sex stereotyping, and/or gender identity is not substantially related to any important government interest, nor is it even

rationally related to any legitimate government interest. The MTC Defendants, Health Care

Defendants, Grievance Defendants, and Custodial Defendants' discrimination against Ms. Dana

because of sex, sex stereotyping, and/or gender identity is also not reasonably related to

legitimate penological interests.

201.    As a direct and legal result of the MTC Defendants, Health Care Defendants,

Grievance Defendants, and Custodial Defendants' actions and/or omissions, Ms. Dana has

suffered and continues to suffer damages including, without limitation: pain and suffering;

emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses

not yet ascertained.

202.    The MTC Defendants, Health Care Defendants, Grievance Defendants, and

Custodial Defendants engaged in the aforementioned acts or omissions and/or ratified such acts

or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted

with willful and conscious disregard of the rights, welfare, and safety of Ms. Dana, thereby

justifying an award of compensatory damages in an amount to be determined at trial. An award

of punitive and exemplary damages in an amount to be determined at trial, is also justified

against each of the Custodial Defendants except for Defendants Tewalt, Derrick, Ramirez,

Valley, Christensen, Dietz, and McKay.

## FIFTH CLAIM FOR RELIEF

**Violation of Equal Protection – Discrimination Based on Status as a Transgender**

**Woman Seeking a Diagnosis of Gender Dysphoria and Based on Her Perceived Mental**

**Health**

**(14th Amendment; 42 U.S.C. § 1983)**

*Against MTC Defendants, Health Care Defendants, and Grievance Defendants*

203.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-130 as if fully set

forth herein.

4841-3651-4492.3

204.     IDOC policies require that prisoners with serious medical conditions be provided with appropriate and necessary medical care. IDOC Policy 401, "Clinical Services and Treatment," states that it is IDOC's policy to provide "proper medical, dental, psychiatric and psychological services, and treatment" to inmates. IDOC Standard Operating Procedure 401.06.03.001, "Access to Care," provides that "in a timely manner, an offender patient can be seen by a clinician, be given a professional clinical judgment, and receive care that is ordered," and that healthcare for inmates focuses on "prevention and maintenance of the offender's health status." The policy requires that "[u]pon identification of any medical or mental health need requiring evaluation and/or intervention by a physician . . . or mental health professional, arrangements must be made to provide timely examination, assessment, and/or treatment by scheduling an appointment with the appropriate practitioner." IDOC Directive 401.06.03.035, "Mental Health Care/Evaluation and Assessment," provides that treatment needs be addressed as soon as possible, and inmates who require acute mental health services beyond those available at the prison will be transferred to an appropriate facility which may include a facility in the community. The MTC Defendants, Health Care Defendants, and Grievance Defendants violated this IDOC Policy, Standard Operating Procedure, and Directive in addressing—or rather, for nearly two and a half years failing to address—Ms. Dana's gender dysphoria.

205.     Ms. Dana suffers from the serious medical condition of gender dysphoria, which continued to cause Ms. Dana serious mental distress and, without necessary treatment, resulted in serious physical harm to Ms. Dana from May 2017 through October 2019.

206.     In October 2019, after nearly two and a half years of improperly denying her the diagnosis—based on failure to assess Ms. Dana according to clinical diagnostic criteria, the MTC Defendants abruptly changed course and granted her the appropriate diagnosis, to which she had been entitled all along.

207.    The MTC Defendants and Health Care Defendants are responsible for providing adequate and necessary diagnosis and medical treatment to Ms. Dana, including treatment for persons diagnosed with gender dysphoria.

208.    The MTC Defendants and Health Care Defendants failed not only to provide adequate and necessary treatment to Ms. Dana consistent with prevailing medical standards of care for gender dysphoria, but failed to assess her according to the clinical diagnostic criteria for gender dysphoria at all. Instead, the MTC Defendants and Health Care Defendants concocted non-empirical rationales completely divorced from the diagnostic criteria to deny Ms. Dana the proper clinical diagnosis in February, May, October, and November 2018. The MTC Meeting Minutes themselves tell the story of this complete breakdown to the required scientific process of diagnosing gender dysphoria. Perhaps most egregiously, the MTC Defendants denied Ms. Dana the appropriate diagnosis in November 2018 despite an assessment from Dr. Campbell indicating that she suffered from gender dysphoria. Yet Dr. Campbell allowed non-medical personnel and clearly unqualified medical personnel on the MTC to substitute their judgment for his. Worse, Ms. Dana was not re-evaluated again for nearly a year, despite promises from the MTC itself to re-evaluate her in February 2019 and IDOC's receipt of a report from Dr. Ettner in May 2019 confirming that Ms. Dana suffered from gender dysphoria. Due to these failures by the MTC Defendants and Health Care Defendants, Ms. Dana suffered unnecessary mental and physical maladies due to her untreated gender dysphoria.

209.    The MTC Defendants also clearly, and improperly, *perceived* Ms. Dana as potentially having other mental health issues, and repeatedly suggested that it would be improper to treat her for gender dysphoria unless and until those other, perceived mental health issues were addressed. In other words, the MTC Defendants consistently behaved toward Ms. Dana as though individuals with, e.g., *perceived* personality disorders or aggression toward other women—even if the MTC Defendants' perceptions were untrue or incorrect—were ineligible to receive a gender dysphoria diagnosis. The gender dysphoria clinical diagnostic criteria and

guidelines flatly contradict this. None of the MTC Defendants pushed back when this medically incorrect, subjective, and patently discriminatory pseudo-scientific belief was introduced during their deliberations of Ms. Dana's case. Nor does the record reflect any of the MTC Defendants even considering that what they perceived to be Ms. Dana's mental health issues were, in fact, manifestations of her untreated gender dysphoria.

210.    The Grievance Form Defendants compounded the failure of the MTC Defendants and Health Care Defendants by misrepresenting to Ms. Dana the true nature of the MTC deliberations and decisions concerning her request for a gender dysphoria diagnosis, specifically by stating in February and May 2018 that Ms. Dana did not satisfy the diagnostic criteria—when, in fact, the MTC Defendants did not evaluate Ms. Dana according to diagnostic criteria in the first instance during that time period. By doing so, the Grievance Form Defendants sheltered the MTC deliberations from scrutiny and caused Ms. Dana to despair that her requests for a gender dysphoria diagnosis would ever be taken seriously by anyone at IDOC, including the MTC Defendants and Health Care Defendants.

211.    The MTC Defendants and Health Care Defendants' acts and/or omissions with respect to Ms. Dana's gender dysphoria diagnosis reflect either a policy, custom, practice and/or procedure of failing to provide proper and necessary medical diagnoses and treatments to inmates suffering from gender dysphoria; an inability to properly diagnose inmates suffering from gender dysphoria due to lack of skill or training; or a refusal, in the case of Ms. Dana, to properly diagnose inmates suffering from gender dysphoria by, among other things, relying on non-clinical diagnostic criteria or the opinions of individuals unqualified to assess gender dysphoria.

212.    From May 2017 to October 2019, each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants was deliberately indifferent to Ms. Dana's medical need to be adequately diagnosed and treated for gender dysphoria, including but not limited to: refusing to or being incapable of rendering a diagnosis of gender dysphoria; refusing to

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

acknowledge the gender dysphoria diagnosis of Plaintiff's expert, Dr. Randi Ettner; and refusing to provide hormone treatment therapy, as well as other medical treatments and accommodations that would have alleviated Ms. Dana's serious medical symptoms. Each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants knew of Ms. Dana's serious medical need for treatment for gender dysphoria and failed to take reasonable measures to address her continued pain and suffering resulting from her undiagnosed and untreated gender dysphoria through October 2019.

213.   The MTC Defendants, Health Care Defendants, and Grievance Defendants are required to diagnose and treat similarly situated IDOC inmates with mental health diagnoses and medical conditions other than gender dysphoria according to the IDOC policies, including those described above, regardless of whether such diagnoses and/or treatments are common or popular.

214.   As described above, however, the MTC Defendants, Health Care Defendants, and Grievance Defendants failed not only to provide adequate and necessary treatment to Ms. Dana consistent with prevailing medical standards of care for gender dysphoria, but failed to assess her according to the clinical diagnostic criteria for gender dysphoria at all.

215.   By official policy, procedure, custom and/or practice, the MTC Defendants, Health Care Defendants, and Grievance Defendants are not permitted to discriminate against transgender inmates diagnosed with gender dysphoria or seeking to be diagnosed with gender dysphoria, including Ms. Dana, by providing them with inferior medical care as compared to similarly situated inmates with medical and mental conditions and/or diagnoses other than gender dysphoria. But the MTC Defendants, Health Care Defendants, and Grievance Defendants did discriminate against Ms. Dana here, specifically *because* she was a transgender woman seeking a diagnosis of gender dysphoria.

216.   The MTC Defendants further discriminated against Ms. Dana specifically *because* they erroneously and improperly perceived her to have other mental health issues—issues which

should not have been considered in rendering a gender dysphoria diagnosis in the first instance, but were used as a rationalization to deny her the diagnosis.

217.    The MTC Defendants, Health Care Defendants, and Grievance Defendants' discriminatory treatment of Ms. Dana because of her status as a transgender woman seeking a diagnosis of gender dysphoria deprived Ms. Dana of her right to equal protection of the laws guaranteed by the Fourteenth Amendment to the U.S. Constitution.

218.    The MTC Defendants' discriminatory treatment of Ms. Dana because of their erroneous and improper perception of her as having other mental health issues, and using those perceptions to deny her a gender dysphoria diagnosis, also deprived Ms. Dana of her right to equal protection of the laws guaranteed by the Fourteenth Amendment to the U.S. Constitution.

219.    The MTC Defendants, Health Care Defendants, and Grievance Defendants' discrimination against Ms. Dana based on her status as a transgender woman seeking a diagnosis of gender dysphoria is neither substantially related to any important government interest, nor even rationally related to any legitimate government interest, and is also not reasonably related to legitimate penological interests.

220.    The MTC Defendants' discrimination against Ms. Dana based on her status as a transgender woman whom they erroneously and improperly perceived to have other mental health issues that they perceived to disqualify her from receiving a diagnosis of gender dysphoria is neither substantially related to any important government interest, nor even rationally related to any legitimate government interest, and is also not reasonably related to legitimate penological interests.

221.    As a direct and legal result of the MTC Defendants, Health Care Defendants, and Grievance Defendants' actions and omissions, Ms. Dana has suffered and continues to suffer damages including, without limitation: pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

4841-3651-4492.3

222.    The MTC Defendants, Health Care Defendants, and Grievance Defendants engaged in the aforementioned acts or omissions and/or ratified such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Ms. Dana, thereby justifying an award of compensatory damages in an amount to be determined at trial. An award of punitive and exemplary damages in an amount to be determined at trial, is also justified against each of the MTC Defendants, Health Care Defendants, and Grievance Form Defendants except for Defendants Valley, Christensen, Dietz, and McKay.

## SIXTH CLAIM FOR RELIEF

**Discrimination on Basis of Disability (Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a)**

*Against IDOC*

223.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-130 as if fully set forth herein.

224.    Based on her gender dysphoria, Ms. Dana suffers from a "disability" within the meaning and scope of the ADA, 42 U.S.C. § 1202. Accordingly, Ms. Dana is a member of the class of persons protected by the ADA and Section 504 of the Rehabilitation Act, which make it unlawful for a public entity and entities receiving federal funds to discriminate against an individual with a disability, or to deny the benefits of the services, programs, or activities of a public entity or entity receiving federal funds to a person with a disability.

225.    Here, Defendant IDOC discriminated against Ms. Dana, with respect to her gender dysphoria, by denying her—for nearly two and half years—the benefits of public services, programs, and activities to which she was entitled as a result of her disability by, *inter alia*, failing or refusing to assess Ms. Dana's gender dysphoria using clinical diagnostic criteria, and failing to provide adequate and necessary medical diagnosis and treatment as a result; improperly and erroneously denying a gender dysphoria diagnosis to Ms. Dana based on

61

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]

perceived mental health issues that were improperly and erroneously perceived to disqualify her from receiving a diagnosis of gender dysphoria; failing to provide proper and reasonable training to custody and health staff in responding to persons with gender dysphoria; and by disciplining Ms. Dana for actions or behaviors related to gender dysphoria and imposing punishments depriving Ms. Dana of programs and activities because of such actions or behavior in a manner detrimental to her health.

226.    Specifically, the MTC Defendants and Health Care Defendants are responsible for providing adequate and necessary diagnosis and medical treatment to Ms. Dana, including treatment for persons diagnosed with gender dysphoria.

227.    The MTC Defendants and Health Care Defendants failed not only to provide adequate and necessary treatment to Ms. Dana consistent with prevailing medical standards of care for gender dysphoria, but failed to assess her according to the clinical diagnostic criteria for gender dysphoria at all. Instead, the MTC Defendants and Health Care Defendants concocted non-empirical rationales completely divorced from the diagnostic criteria to deny Ms. Dana the proper clinical diagnosis in February, May, October, and November 2018. The MTC Meeting Minutes themselves tell the story of this complete breakdown to the required scientific process of diagnosing gender dysphoria. Perhaps most egregiously, the MTC Defendants denied Ms. Dana the appropriate diagnosis in November 2018 despite an assessment from Dr. Campbell indicating that she suffered from gender dysphoria. Yet Dr. Campbell allowed non-medical personnel and clearly unqualified medical personnel on the MTC to substitute their judgment for his. Worse, Ms. Dana was not re-evaluated again for nearly a year, despite promises from the MTC itself to re-evaluate her in February 2019 and IDOC's receipt of a report from Dr. Ettner in May 2019 confirming that Ms. Dana suffered from gender dysphoria. Due to these failures by the MTC Defendants and Health Care Defendants, Ms. Dana suffered unnecessary mental and physical maladies due to her untreated gender dysphoria.

4841-3651-4492.3

228.    The MTC Defendants also clearly, and improperly, *perceived* Ms. Dana as potentially having other mental health issues, and repeatedly suggested that it would be improper to treat her for gender dysphoria unless and until those other, perceived mental health issues were addressed. In other words, the MTC Defendants consistently behaved toward Ms. Dana as though individuals with, e.g., *perceived* personality disorders or aggression toward other women—even if the MTC Defendants' perceptions were untrue or incorrect—were ineligible to receive a gender dysphoria diagnosis. The gender dysphoria clinical diagnostic criteria and guidelines flatly contradict this. None of the MTC Defendants pushed back when this medically incorrect, subjective, and patently discriminatory pseudo-scientific belief was introduced during their deliberations of Ms. Dana's case. Nor does the record reflect any of the MTC Defendants even considering that what they perceived to be Ms. Dana's mental health issues were, in fact, manifestations of her untreated gender dysphoria.

229.    The Grievance Form Defendants compounded the failure of the MTC Defendants and Health Care Defendants by misrepresenting to Ms. Dana the true nature of the MTC deliberations and decision concerning her request for a gender dysphoria diagnosis, specifically by stating in February and May 2018 that Ms. Dana did not satisfy the diagnostic criteria—when, in fact, the MTC Defendants did not evaluate Ms. Dana according to diagnostic criteria in the first instance during that time period. By doing so, the Grievance Form Defendants sheltered the MTC deliberations from scrutiny and caused Ms. Dana to despair that her requests for a gender dysphoria diagnosis would ever be taken seriously by anyone at IDOC, including the MTC Defendants and Health Care Defendants.

230.    The Custodial Defendants denied various requests and/or permitted the denial of requests by Ms. Dana for commissary products allowed to similarly situated female inmates (i.e. transgender women suffering from gender dysphoria), including but not limited to women's underwear and cosmetics. The Custodial Defendants also disciplined Ms. Dana for wearing her hair in hairstyles deemed to be "feminine" that are allowed for similarly situated female inmates.

4841-3651-4492.3

231.    The Custodial Defendants also disciplined and/or permitted the discipline of Ms. Dana for sex-based behaviors because she is transgender, because she is attempting to transition genders, and/or because of the sex-based stereotype that people who are assigned the male sex at birth should display only stereotypically male characteristics, behaviors, or dress. The Custodial Defendants thus treated Ms. Dana differently based on her sex and her perceived non-conformity with sex stereotypes, including the expectation that a person's gender must conform to the sex assigned at birth.

232.    The Custodial Defendants' treatment of Ms. Dana is based on her sex assigned at birth and sex-based stereotypes that Ms. Dana should express herself in a manner that does not include the wearing of cosmetics, "feminine" hairstyles, women's underwear, and other "feminine" behaviors and/or expressions.

233.    Throughout Ms. Dana's incarceration, the Custodial Defendants also repeatedly disciplined and punished her for expressing her gender identity in a manner that posed no legitimate threat to the safety and security of the prison and that were related to gender dysphoria—and that would have been acceptable under IDOC policies had she been given the gender dysphoria diagnosis she deserved. Instead, the Custodial Defendants' conduct served only to harass Ms. Dana and drive her deeper into despair. For example, the Custodial Defendants issued numerous "Disciplinary Offense Reports" to Ms. Dana, including the following:

- On May 5, 2018, Ms. Dana was reprimanded for wearing makeup because she did not have a gender dysphoria diagnosis.

- On May 13, 2018, Ms. Dana was reprimanded for wearing makeup because she did not have a gender dysphoria diagnosis.

- On May 28, 2018, Ms. Dana was disciplined by C/O Walton for using pen ink as eye-liner, because she did not have a gender dysphoria diagnosis.

- On August 26, 2018, Ms. Dana was forced to remove her makeup by C/O Covarrubias, because she did not have a gender dysphoria diagnosis.

- On October 18, 2018, Ms. Dana was given a warning by C/O Gresick for wearing makeup, because she did not have a gender dysphoria diagnosis.

- On October 21, 2018, Ms. Dana was disciplined by C/O Covarrubias for using pen ink as eye-liner, because she did not have a gender dysphoria diagnosis.

234.     The MTC Defendants, Health Care Defendants, Grievance Defendants, and Custodial Defendants' acts and omissions—all operating under the auspices and on behalf of Defendant IDOC, a public entity under the ADA—violated the ADA and Section 504, which prohibit discrimination on the basis of physical and mental disability, and protect persons such as Ms. Dana from the type of injuries and damages set forth herein.

235.     Defendant IDOC is not entitled to immunity from suit under the Eleventh Amendment for this cause of action.

236.     As a direct and legal result of Defendant IDOC's actions and omissions, Ms. Dana has suffered and continues to suffer damages including, without limitation: pain and suffering; emotional, psychological, and physical distress; and other pecuniary losses not yet ascertained.

<strong>SEVENTH CLAIM FOR RELIEF</strong>

<strong>Violation of Affordable Care Act (42 U.S.C. § 18116)</strong>

<em>Against Defendants Tewalt, Derrick, Ramirez, Valley, Christensen, Dietz and McKay in their official capacities</em>

237.     Plaintiff repeats and re-alleges the allegations in paragraphs 1-130 as if fully set forth herein.

238.     Section 1557 of the ACA, 42 U.S.C. § 18116, prohibits covered entities from discriminating on the basis of sex for the purpose of providing health care services.

239.     Covered entities include "any health program or activity, any part of which is receiving Federal financial assistance." IDOC is a covered entity subject to the ACA's nondiscrimination requirement.

65

4841-3651-4492.3

240.    As set forth above, the MTC Defendants, Health Care Defendants, and Grievance Defendants discriminated and continued to discriminate against Ms. Dana on the basis of sex by not only failing to provide adequate and necessary treatment to Ms. Dana consistent with prevailing medical standards of care for gender dysphoria, but failing to assess her according to the clinical diagnostic criteria for gender dysphoria at all, thereby denying her adequate and necessary medical diagnosis and treatment to which she is entitled as someone who is transgender, has gender dysphoria, and is attempting to transition genders. Defendants Valley, Christensen, Dietz, and McKay were part of the MTC and were directly involved in this violation of the ACA's non-discrimination requirement. Defendants Tewalt, Derrick, and Ramirez, by virtue of their supervisory roles, knew or should have known that the MTC was acting against Ms. Dana in violation of the ACA's non-discrimination requirement.

241.    As set forth above, the MTC Defendants, Health Care Defendants, and Grievance Defendants discriminated and continued to discriminate against Ms. Dana on the basis of sex by not only failing to provide adequate and necessary treatment to Ms. Dana consistent with prevailing medical standards of care for gender dysphoria, but failing to assess her according to the clinical diagnostic criteria for gender dysphoria at all, thereby denying her adequate and necessary medical treatment based on their own sex stereotyping and/or a belief that people who are assigned the male sex at birth should display only stereotypically male characteristics, behaviors, and dress. Defendants Valley, Christensen, Dietz, and McKay were part of the MTC and were directly involved in this violation of the ACA's non-discrimination requirement. Defendants Tewalt, Derrick, and Ramirez, by virtue of their supervisory roles, knew or should have known that the MTC was acting against Ms. Dana in violation of the ACA's non-discrimination requirement.

242.    As a direct and legal result of Defendants Tewalt, Derrick, Ramirez, Valley, Christensen, Dietz and McKay's actions and omissions, Plaintiff has suffered and continues to

suffer damages including, without limitation: pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

## EIGHTH CLAIM FOR RELIEF

## Retaliation (1st Amendment; 42 U.S.C. § 1983)

### *Against Custodial Defendants*

243.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-130 as if fully set forth herein.

244.    The PREA is a federal law enacted in 2003 to eliminate sexual abuse in confinement. The final standards developed to reduce prison sexual abuse were published by the Department of Justice on June 20, 2012. These standards called for the creation of a national PREA hotline that inmates may utilize to report instances of sexual abuse.

245.    The Custodial Defendants are responsible for ensuring that IDOC inmates have the ability to use the PREA hotline.

246.    In response to the assaults by inmate Geib in May 2018 and June 2018, Ms. Dana called the PREA hotline multiple times in the spring and summer of 2018 to report the offending inmate. However, instead of receiving assistance, once Defendants Smyth, Walton, and other of the Custodial Defendants became aware that Ms. Dana had been using the PREA hotline, they told her that she could no longer use it, as it was creating additional "unnecessary" work for them. Defendants Smyth, Walton, and other IDOC correctional officers also informed Ms. Dana that if she did not stop calling PREA, they would throw her in "the hole" (solitary confinement) "for her own protection," and all of her feminine items would be confiscated. Defendants Smyth, Walton, and other IDOC correctional officers also threatened to confiscate Ms. Dana's feminine items if she continued to call the PREA hotline, in violation of the PREA statute.

247.    Defendant Dietz's written response to Ms. Dana's IDOC Grievance Form of May 8, 2018 — "I concur with Sgt. Miller's response. You are not being abused or harassed. If you continue to violate rules it will be addressed with you. This does not constitute abuse or

harassment. Your PREA allegations have been investigated and found to be unsubstantiated." — pertained to an earlier instance of Ms. Dana's use of the PREA hotline, and did not explicitly threaten her. Nevertheless, Defendant Dietz's victim-blaming had a chilling effect on Ms. Dana, and also violated the PREA statute.

248.    The purposes of the PREA include: to establish a zero-tolerance standard for the incidence of prison rape in prisons in the United States; to increase the accountability of prison officials who fail to detect, prevent, reduce, and punish prison rape; and to protect the Eighth Amendment rights of Federal, State, and local prisoners. 34 U.S.C. § 30302(1), (6), (7).

249.    The Custodial Defendants' responses to Ms. Dana's use of the PREA hotline included: Defendants Smyth and Walton's intimidating her from attempting to report a sexual assault without repercussions; and Defendant Dietz's attempting to chill Ms. Dana's right to access the PREA hotline by responding to her, in writing, that her claims had been investigated and determined to be unsubstantiated. Moreover, none of the Custodial Defendants' took any affirmative steps to protect Ms. Dana's statutory or free speech rights. Each of these acts violated the statutory purposes of the PREA and had a chilling effect of Ms. Dana.

250.    By threatening Ms. Dana with retaliation if she continued to make use of the PREA hotline to report sexual assaults, the Custodial Defendants also violated a number of Federal Regulations, including: 28 CFR § 115.53 (Inmate access to outside confidential support services); 28 CFR § 115.61 (Staff and agency reporting duties); and 28 CFR § 115.67 (Agency protection against retaliation).

251.    Following the threats by Defendants Smyth, Walton, Dietz, and other Custodial Defendants, and the failure of any of the Custodial Defendants to affirmatively act to protect Ms. Dana's statutory and free speech rights, Ms. Dana ceased using the PREA hotline, and did not report any other instances of sexual assault or harassment, though they continued to occur.

252.    The Custodial Defendants' retaliation against Ms. Dana for exercising her right to communicate with the outside world through the PREA hotline deprived her of her right to freedom of speech guaranteed by the First Amendment to the U.S. Constitution.

253.    The Custodial Defendants' violation of Ms. Dana's freedom of speech is neither substantially related to any important government interest, nor even rationally related to any legitimate government interest or penological interest.

254.    As a direct and legal result of the Custodial Defendants' actions and omissions, Ms. Dana has suffered and continues to suffer damages including, without limitation: pain and suffering; emotional, psychological, and physical distress; violation of dignity; and other pecuniary losses not yet ascertained.

255.    The Custodial Defendants engaged in the aforementioned acts or omissions and/or ratified such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying an award of compensative damages in an amount to be determined at trial. An award of punitive and exemplary damages in an amount to be determined at trial, is also justified against each of the Custodial Defendants except for Defendants Tewalt, Derrick, Ramirez, Valley, Christensen, Dietz, and McKay.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendants as follows:

(a)     For injunctive and declaratory relief, including but not limited to requiring Defendants to provide Plaintiff with adequate and necessary medical care; requiring Defendants to provide Plaintiff equal access to clothing, cosmetic, and hygiene items available to inmates housed in female institutions; requiring Defendants to house Plaintiff at an institution consistent with her gender identity; declaring unconstitutional and in violation of federal law Defendants' practices in

4841-3651-4492.3

denying Plaintiff and other similarly situated inmates with adequate and necessary medical treatment;

(b)     For compensatory, general, and special damages, in an amount to be determined at trial;

(c)     For punitive damages against individual Defendants and Corizon in an amount to be proven at trial;

(d)     For reasonable costs of this suit and attorneys' fees and expenses; and

(e)     For such further relief as the Court may deem just, proper, and appropriate.

## **DEMAND FOR JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury.


Dated: June 1, 2020                              NIXON PEABODY LLP


                                                By: */s/ Seth D. Levy*
                                                      Seth D. Levy
                                                      Fredric C. Nelson
                                                      Matthew A. Richards
                                                      Conor C. McNamara
                                                      *Attorneys for Plaintiff Larry Dana*


70

SECOND AMENDED COMPLAINT [1:18-cv-00298-DCN]